The appellant was indicted for rape by the grand jury of Houston County. On arraignment, with his counsel present, he entered a plea of not guilty and not guilty by reason of insanity. The plea of not guilty by reason of insanity was subsequently withdrawn and no evidence on the appellant's sanity was presented to the jury.
Following a jury trial, Speigner was found guilty and sentenced to life imprisonment.
A full recitation of the facts will not be necessary in this appeal since the issue of sufficiency of the evidence was not preserved for review.
Briefly, the facts are as follows:
The prosecutrix testified that on November 12, 1976 she went to bed around 10:45 or 11:00 P.M. She stated that the light in the aquarium in her bedroom was on and this light illuminated the bed.
She testified that around midnight she was awakened by the feeling of a sharp object in the middle of her back and noticed a man standing near the bed. The prosecutrix recalled that when she realized someone was there, she "shot across the bed" toward the window. She said her assailant then pulled her by the feet to the bottom of the bed and turned her over. During the scuffle, according to the prosecutrix, the man hit her in the head and told her that he had a knife and would kill her if she did not cooperate.
The prosecutrix said the man took her clothes off, that he performed cunnilingus upon her, and then had sexual intercourse with her against her will. She stated that she was able to look at the man's face approximately fourteen times during the fifteen minutes that he was there.
During the trial the prosecutrix made a positive in-court identification of the appellant as her assailant.
 I
The appellant maintained that the trial court abused its discretion when it failed to grant his motion for a change of venue. He argues that the pre-trial publicity attending his case was exceptional, beginning on the day he was arrested, and continuing to the date of his trial on June 20, 1977. Further counsel claims that; "The guilt of James Speigner was established in the press and not in the court of law," and that, "the actual trial occurred in newsstands and on television sets throughout Houston County."
On June 16, 1977, the trial court conducted a hearing on five defense motions, the first being the motion for a change of venue and continuance. Briefly, that testimony was as follows:
Jerry Vann, the news director at WTVY television in Dothan, Alabama, was called to testify and played a video tape of the first news report he had concerning this case. Vann said the tape had been shown as the lead story on the 6:00 P.M. news on the day of the appellant's arrest, and again as the fifth story on the night news at 10:00 o'clock. Vann explained that the tape was of a news conference held by the chief of police.
This video tape was played for the court and the taped interview with the chief of police is outlined in pertinent part as follows:
 "We of the police department are pleased to announce that an arrest has been made in the series of assaults upon females occurring in the western section of the city for the past eight months. At 2:10 P.M. this afternoon, James Alex Speigner, a white male who gave his address as 904 West Newton Street, was charged *Page 592 
with two counts of rape and one count of first degree burglary. The first degree burglary and one of the rapes occurred on November the 13th, 1976, in the two-hundred block of East Woodland Street and the other rape occurred on July the 7th, 1976, in the fifteen-hundred block of West Burdesaw Street. Our investigation is continuing at this time. Speigner has been booked and is being held on State warrants in the city jail without bond on orders of Judge White."
In response to a question asked by the TV interviewer, the chief of police answered:
 "Yes, sir, we are of the — convinced at this time that the subject is responsible for the series [of rapes] that have been occurring since July of 1976. . . ."
Vann testified that on April 28th, six days later, the TV station ran a lead story concerning appellant's bond being set at $300,000, and it was run on the 10:00 o'clock news that night. He stated that on May 6th, two other stories were run at 6:00 P.M., and the second at 10:00 P.M., concerning appellant's being held without bond on two counts of rape and one count of burglary. Vann stated this was the last TV report concerning the appellant.
Vann also gave testimony concerning the number of households the TV station reached at different times, and the number and age of people that the TV broadcast had reached.
On cross-examination, Vann testified that he considered the coverage given to appellant to be fair and objective. Also, he did not believe that the coverage would in any way prevent the defendant from having a fair trial in Houston County.
John Givens, news director of station WDHN TV in Dothan, testified that his station had run two news spots concerning the appellant, one on May 6th and one on May the 18th. These spots related to the denial of bail for appellant.
During cross-examination, he said that these two news spots were not lead stories but were run as the ninth and thirteenth news items on the programs. Givens said he did not know how many households his station reached, but that it served the tristate area.
Vic Bubbit, city editor of the Dothan Eagle, testified that approximately twelve stories were run concerning appellant preceding his trial. Bubbit also identified several of the newspaper articles.
One of these articles, appearing on April 24, 1977, reported:
 "Police Thursday night picked up Speigner for questioning but released him. Officers said that he agreed to come to the police headquarters voluntarily Friday for the lie detector tests. Officers said he failed one test and that his attorney, Clarence Slaughter, stopped the second test. . . ."
Further down in the same article, the police chief, Cater Williams, was quoted as saying:
 "He is convinced that Speigner is the person responsible for the series of assaults on the young women."
During cross-examination, Bubbit said these stories were routine reporting and he felt that the Dothan Eagle had reported the activities in the case on a fair and accurate basis. Further, he said he believed the appellant could get a fair trial in Houston County. One reason for so much publicity, according to Bubbit, was the fact that numerous motions for hearing were held pertaining to the case.
Dennis Latham testified concerning the news coverage from WOOF AM-FM Radio pertaining to this case. He stated that numerous broadcasts were made concerning the case and acknowledged that approximately fourteen broadcasts were run in all. Latham said there had been a live broadcast from the city hall the day appellant was arrested and stated that the audio portion of the broadcast that he used was the same as that used on the video tape shown by WTVY television station. [Tape quoted above].
Latham testified that, according to surveys, WOOF reached approximately 63,150 people in a thirteen-county area for five minutes each week. *Page 593 
During cross-examination, Latham stated that he believed "WOOF" recorded these events fairly and accurately.
Leonard Gifford was the manager of a warehouse on Speigner Street in Dothan. He stated he had read most of the articles in the "Dothan Eagle" and felt that appellant could not get a fair trial. Further, that he had discussed the case with his "co-workers and compatriots" and; "the case seemed cut and dried to them — that he [appellant] did it."
On cross-examination, Gifford admitted that appellant's father was his landlord and that appellant's father had asked Gifford to appear at the hearing.
Clarence W. Slaughter, a practicing attorney in Dothan, Alabama, testified that he was employed by Alex Speigner to represent his son (the appellant, James Speigner) in the case at bar. Slaughter testified that his representation of the appellant was reported in the Sunday paper and stated that he had received numerous telephone calls, concerning the case. Slaughter said that, during the two-day period, he had received approximately eighteen telephone calls from unidentified people, as well as people, he had known over a period of years. He stated that the essence of the calls was that; "I used to think that you were a guy of integrity, but I no longer do that because you are representing that rapist." He said the parties went on to explain that it was in the newspaper and they had read it and that "stuff wouldn't be in the paper unless it were true. And stuff in that general nature."
Slaughter recalled that during the week he had many encounters with people in all walks of life, from "low to high," and "it was the same situation, `you are representing that rapist, that person.'"
Slaughter acknowledged that it was his impression, from talking with these people, that they had concluded Mr. Speigner was guilty.
A motion for change of venue is within the sound discretion of the trial court, and absent a showing of abuse of that discretion, its ruling will not be disturbed. Johnson v. State, Ala.Cr.App., 335 So.2d 663; Yoemans v. State, 55 Ala. App. 160,314 So.2d 79; Hurst v. State, 54 Ala. App. 254, 307 So.2d 62. Publicity alone, even if inordinate, is not sufficient to warrant a change of venue. Peoples v. State, Ala.Cr.App.338 So.2d 515. The effect of that publicity on the venire must be established, and it is the burden of the appellant to show, to the reasonable satisfaction of the trial court, that an impartial trial and an unbiased verdict cannot be had in that county. Peoples, supra; Johnson, supra; Yoemans, supra; Rickettv. State, Ala.Cr.App., 337 So.2d 77.
In determining whether the defendant received a trial before a fair and impartial jury, the fundamental consideration is not the amount of publicity in a specific case but whether the defendant in that case received a fair and impartial trial.People v. Speck, 41 Ill.2d 177, 242 N.E.2d 208.
In Beck v. Washington, 369 U.S. 541, 556, 82 S.Ct. 955,8 L.Ed.2d 98 [change of venue denied on ground of prejudicial publicity], the Supreme Court observed:
 "Of course there could be no constitutional infirmity in these rulings if petitioner actually received a trial by impartial jury."
The Supreme Court of the United States recognized in Murphyv. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589, that juror exposure to news accounts of the crime with which a defendant is charged does not alone, presumptively, deprive that defendant of due process. The court went on to say:
 "To resolve this case, we must turn, therefore, to any indications in the totality of circumstances that petitioner's trial was not fundamentally fair."
In Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, the Supreme Court laid down the following standards to be used in determining whether a defendant received a trial before a fair and impartial jury: *Page 594 
 "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.
 "This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."
However, these standards were qualified by the Supreme Court in Murphy v. Florida, supra, when the Supreme Court held:
 "[J]uror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate `the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'"
Applying these standards, we now focus our inquiry on the basic question of whether the jurors, at the defendant's trial, demonstrated that they were able to lay aside any impression or opinion that they might have had as a result of the publicity and render a verdict based on the evidence offered in court.
We have examined the voir dire examination of the prospective jurors conducted during the qualification procedures, and found the following:
"THE COURT: All right. Let me ask you now, are there any questions for the State of Alabama in this case Mr. Sorrells?
"MR. SORRELLS: No questions, Your Honor.
"THE COURT: All right. Any questions for the Defendant, Mr. Harrison?
"MR. HARRISON: Yes, sir, Your Honor, I have a few. Has any Juror within the past five years been the victim of an assault or other crime?
"JURORS: No response.
"MR. HARRISON: Has any member of your immediate family or close friends been a victim of a crime as far as you know or an assault in any manner?
"JURORS: No response.
"MR. HARRISON: Have any of you Jurors read any newspaper articles or heard any radio broadcast or television broadcast of the events in this case?
"JURORS: (Several Jurors raised their hands.)
"MR. HARRISON: If you will, let's start on this end. If any of you Jurors respond to the affirmative — have you read or heard anything in the newspapers other than — what is your name?
"JURORS: Ballatine. Amberson. Baxley. Mrs. Brown. Byoer. Carpenter.
"MRS. CLARK: I have read the newspapers.
"MRS. DAVIS: Newspaper.
"WILBUR FLOYD: Newspaper.
"MRS. HARGROVE: I read the newspaper.
"MR. HARRISON: And you?
"A JUROR: No.
"MR. HARRISON: And you?
"MR. HALL: Yes, sir. I have read the newspaper.
"MR. HARRISON: How about you, Mr. Johnston? Do you know anything about the facts in this case?
"MR. JOHNSTON: I have read the newspaper.
"MR. HARRISON: Any of you Jurors that responded to the affirmative that you read the newspaper article or TV or radio broadcast, do any of you Jurors feel that your awareness as to publicity by the News Media had influenced you or prejudiced your mind in any way, one way or the other about this case?
"THE COURT: If anybody feels it would please raise your hand. *Page 595 
"THE JURORS: No response.
"MR. HARRISON: Do you Jurors feel you could judge this case completely from the evidence from the witnesses and be uninfluenced by anything you have previously heard or read?
"JURORS: No response.
"MR. HARRISON: Thank you.
"THE COURT: Okay. Now if there are no further questions gentlemen, I hereby declare these Jurors qualified and you Ladies and Gentlemen may take seats back out in the Courtroom.
 "(Thereupon, the above group of Jurors returned to their seats in the Courtroom and a new group was called up before the Bench and questioned by the Court as to their qualifications. At the end of the following proceedings were had, to-wit:)
"THE COURT: All right. Mr. Sorrells, any questions for the State?
"MR. SORRELLS: No questions, Your Honor.
"THE COURT: Any questions for the Defendant, Mr. Harrison?
"MR. HARRISON: Yes, sir, Your Honor. If it please the Court, has any member of this section of the Venire been a victim of a criminal assault within the last five years?
"JURORS: No response
"MR. HARRISON: Any members of your immediate family or close friends?
"A JUROR: Yes. Mella Jo Parrish.
"MR. HARRISON: Any other Jurors?
"JURORS: No response.
"MR. HARRISON: You Jurors heard the other questions relative to the knowledge of the facts in this case and have you through the newspaper, television or radio broadcasts that you have heard about any of it? If any of you have any knowledge would you please say so? I will read the numbers. No. 1. Lewis.
"MRS. LEWIS: Newspaper.
"MR. HARRISON: No. 2, McCord?
"MRS. McCORD: The newspaper.
"MR. HARRISON: No. 3?
"A JUROR: Newspaper.
"MR. HARRISON: No. 4?
"A JUROR: Newspaper.
"MR. HARRISON: No. 5, Mrs. Peterson?
"MRS. PETERSON: Radio.
"MR. HARRISON: Mr. Smith?
"MR. SMITH: Newspaper.
"MR. HARRISON: Mr. Standifer?
"MR. STANDIFER: The newspaper.
"MR. HARRISON: Mr. Roy M. Ware?
"MR. WARE: No.
"MR. HARRISON: Frank West?
"MR. WEST: Newspaper.
"MR. HARRISON: Mr. Jackson Ware?
"MR. WARE: Newspaper.
"MR. HARRISON: Mr. Crowder?
"MR. CROWDER: Newspaper.
"MR. HARRISON: Mr. Kirkland?
"MR. KIRKLAND: Newspaper.
"MR. HARRISON: And you?
"A JUROR: Newspaper.
"MR. HARRISON: Mrs. Parrish?
"MRS. PARRISH: Newspaper.
"MR. HARRISON: Mr. McCall?
"MR. McCALL: Newspaper.
"MR. HARRISON: And you?
"MR. LEWIS: Newspaper.
"MR. HARRISON: And you?
"A JUROR: Newspaper.
"MR. HARRISON: And you, Mrs. Lewis?
"MRS. LEWIS: No.
"MR. HARRISON: And you?
"MRS. KING: I work with the Dothan Eagle and saw the headlines.
"MR. HARRISON: Mr. Martin?
"MR. MARTIN: No.
"MR. HARRISON: Melba Addison?
"MRS. ADDISON: Newspaper.
"MR. HARRISON: And you?
"A JUROR: Newspaper.
"MR. HARRISON: Mr. Sawyer? *Page 596 
"MR. SAWYER: Newspaper.
"MR. HARRISON: Mrs. Lawson?
"MRS. LAWSON: Newspaper.
"MR. HARRISON: And you?
"MR. RESPRESS: Newspaper.
"MR. HARRISON: Do any of you Jurors feel any fact you might have gained out of advanced publicity through newspaper, television or radio about the facts of this case in any manner has influenced your mind in the event you are selected as a Juror in one way or the other?
"THE JURORS: (All Jurors shake their heads to the negative.)
"MR. HARRISON: Does any Juror feel that you will have any trouble at all through the advanced publicity, in judging this case solely from the evidence that comes from the Witness Stand?
"THE JURORS: No response.
"MR. HARRISON: That is all.
"THE COURT: If there are no further questions, I hereby declare all of you qualified and you may take seats out in the Courtroom.
 "(Thereupon, the remainder of the Jury Venire returned to their seats in the Courtroom and the following proceedings were had, to-wit:)
"THE COURT: All right. Now Gentlemen, I am going to ask the Attorney for the State and Mr. Harrison both of you and the Defendant, to go with Mrs. Trant into the room right here at the end of the hall and strike your Jury.
"(Thereupon, the above named parties left the presence and hearing of the Courtroom in order to strike their Jury. Upon returning to the presence and hearing of the Courtroom, the Jury was struck, sworn by the Clerk and placed in the Witness Box . . ."
As can be seen from the voir dire of the prospective jurors in this case, the jurors acknowledged that the publicity by the "media" would not influence or prejudice them in any way. No hostility toward the appellant by the jurors who served in his trial was exhibited which might suggest "a partiality that could not be laid aside." Murphy v. Florida, supra. There is no evidence in the entire record upon which the appellant can base a claim of juror partiality. Nowhere in the record does it show that any venireman was excused because he had formed an opinion as to the appellant's guilt. On the contrary, the record seems to indicate that the defendant accepted all jurors and did not challenge any of them for cause.
"The indicia of impartiality" cannot be disregarded in this case. Murphy v. Florida, supra. The general atmosphere in the community and in the courtroom was not of the inflammatory nature requiring the setting aside of the juror's assurances. See Redow v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417,10 L.Ed.2d 663; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628,14 L.Ed.2d 543; Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507,16 L.Ed.2d 600.
Most of the alleged prejudicial publicity occurred at the time of appellant's arrest on April 24, 1977, some two months before his trial. The alleged prejudicial effect of media coverage was diminished by the passage of time. Mathis v.State, 52 Ala. App. 668, 296 So.2d 755.
As the date of trial approached, there were further news articles that, on the basis of the testimony given during the hearing on the motion for a change of venue, were merely factual accounts.
The crime here was somewhat of a sensational nature and it would follow that some of the publicity would be of the same character. We are satisfied, however, from a review of the exhibits, the video tape, and the voir dire examination of the prospective jurors, that the defendant received a trial at the hands of a fair and impartial jury in Houston County under the rules established in Irvin v. Dowd, supra. Further, it is our judgment that the circuit court did not err in denying the motion for a change of venue.
We have examined not only the questions raised in brief by the appellant, but also the entire record, to determine whether *Page 597 
prejudicial error occurred. We have found none, and it is our opinion that the judgment of conviction by the Houston Circuit Court must be affirmed.
AFFIRMED.
All the Judges concur.