[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1373 
Appellant was indicted under § 13A-5-31 (a)(2), Code of Alabama 1975, for robbery or attempts thereof, during which the victim was intentionally killed. The jury returned a verdict of guilty of the capital offense charged in the indictment. After a hearing on aggravating and mitigating circumstances, the jury returned a verdict fixing the appellant's sentence at life imprisonment without parole. Subsequently, the trial court sentenced appellant to life imprisonment without parole.
Seventeen-year-old Todd Bates testified he was fishing with a group of fifteen men, women, and children at Bailey's Bridge in Winston County, Alabama, on June 19, 1981. Included in the group were Todd's father, Jim Bates, and Mr. Bates's friend, James (Jim) McGuire. When the group of fishermen arrived at the bridge around 9:30 p.m., there were already present several strangers. The strangers were sitting on their automobile hood and appeared to be "drinking." Among this group was one Randy Twilley. *Page 1374 
After approximately twenty-five minutes, another group of several more strangers arrived. Included in this group were the appellant and his brother, Michael Crowe. They disembarked their vehicle, which they had parked on the bridge with the other two groups' vehicles, and picked up a passing dog and threw it off the bridge.
After a while, a fight broke out between appellant and a member of Twilley's group over a torn shirt. During the fight, appellant repeatedly slammed his opponent's head against the side of the bridge. When the fight was over, appellant and Randy Twilley approached James McGuire and attempted to place a lantern, with which McGuire was fishing, into the water. When McGuire indicated the lantern was fine where he had placed it, appellant began to yell to him. Appellant called McGuire "Big Ears," and told him to "go back to the cornfields where he came from."
After this episode, Twilley convinced the appellant to leave, telling him they would come back and get McGuire. They left in their automobiles at approximately 10:00 p.m.
The Bates group continued to fish from the bridge until around 11:30 p.m., when appellant's group returned in Twilley's automobile. Todd Bates was within seven or eight yards of James McGuire at this point. Twilley stopped his vehicle behind Todd in the center of the roadway.
Appellant, Twilley, and Michael Crowe got out of the automobile and, with Michael playing a guitar, began to loudly "sing to the fish." Todd heard another automobile approaching, and at his suggestion, Twilley moved his vehicle out of the way. The three then continued to generally annoy or "bug" Todd's group about their fishing, by singing and pestering them with questions.
As Michael continued to sing and play the guitar, appellant and Twilley again approached James McGuire. Appellant, observing that Mr. McGuire had a hunting and fishing knife in his pants pocket, asked McGuire why he carried the knife. When McGuire explained that hunters and fishermen carry knives, appellant stated, "If you want to get your weapons, I'll go to my car and get my .357."
Appellant made several steps toward Twilley's vehicle, and then turned and ran up to Mr. McGuire. As appellant ran up, he reached around McGuire, who was facing out toward the water fishing, and took the knife from Mr. McGuire's pocket.
Todd testified he watched as appellant brandished the knife at Mr. McGuire. He could see the blade reflecting in the light from four lanterns on the bridge which the men were using while fishing. Todd described the ensuing events as follows:
 "After he took the knife out, he was flashing it around and stuff, and when he took the knife out, Jim turned around and said, `We don't want to cause no trouble. We're just up here fishing with the boys.' He said, `We'll get our stuff together and leave you all alone.'
 "Q Okay. Did Jim, at this time, still have anything in his hand?
"A Yes, sir, still had his fishing rod.
"Q All right. And then?
 "A And then Michael Crowe told Billy, he said, `Come on. Let's don't cause no trouble. Let's leave them alone.' That is when Billy said, `No, I'm going to kill this mother fucker.'
"Q Okay. What happened next?
"A After that, Twilley grabbed him.
"Q All right. Grabbed who?
"A Jim.
"Q How did he grab him, if you know?
 "A He grabbed him by the back of the hair and bent him back.
"Q All right. Did he grab him from behind?
"A Yes, sir.
. . . .
 "A After he grabbed him and bent him back, Crowe was standing right here — (Indicating.)
"Q By `Crowe,' who do you mean?
 "A Billy Crowe. He come around and cut him right there and stabbed him. (Indicating.)" *Page 1375 
The appellant backed away after stabbing Mr. McGuire and yelled at Mr. Bates to get Mr. McGuire "to the hospital that he just loses his temper." One of appellant's group yelled for him to get the knife, which had fallen to the pavement, and the appellant went forward and got the knife. Todd, at his father's instructions, went and observed Twilley's vehicle tag number, despite Twilley's efforts to push Todd down and to bend the tag out of sight. The appellant's group then got into their vehicle and fled.
Scott Burchfield, another seventeen-year-old member of the fishing party, testified he was among the Bates fishing group. His testimony largely substantiated Todd's account. He did not observe the stabbing, however, although he did see appellant brandishing the knife at McGuire before the stabbing occurred. Neither did he hear all the statements made, nor could he match the voices with the persons who were speaking.
Billy Burchfield, Scott's father, testified similarly to Scott. He did, however, actually see the appellant take the knife from Mr. McGuire and stab him with it. Mr. Burchfield stated there was a full moon that night and that the victim had a lantern directly in front of him. He testified that after Crowe's group left, they placed Mr. McGuire in an automobile and rushed him to the hospital.
Dr. Josefino Aguilar, a State forensic pathologist, testified he examined the body of James McGuire on June 20, 1981. The body evidenced one stab wound which was inflicted by a single-edge knife. The path of the blade passed through the middle of the chest, perforated the tip of the heart and cut into the covering of the lung. On the surface of the body, over the stab wound, there was a blue bruise or contusion. This indicated the handle of the knife had reached the skin with sufficient force to cause the bruise. The direction of the wound was from front to back and slightly upward. In Dr. Aguilar's opinion, Mr. McGuire died as a result of a stab wound to the left side of the chest.
Brian Trammell, another member of the fishing party, testified and substantiated the details of Todd Bates's testimony.
Chief Deputy Jack Gilliland of the Winston County Sheriff's Department testified he traveled to Houston, Texas, in June of 1982 to obtain custody of the appellant from the Sheriff's Department there. He stated appellant signed a waiver of extradition on the day on which the extradition hearing had been set.
At the conclusion of the State's case, appellant's motion for a judgment of acquittal was denied. Appellant then rested without presenting any evidence on his behalf.
At the sentencing hearing following the guilt phase of the trial, the State presented evidence that appellant committed the intentional killing while under a sentence of imprisonment in the State of Alabama. The appellant called several character witnesses, including his mother, who testified to his good reputation as to violence.
 I
Appellant argues the trial court erred in denying his motion for a change of venue based upon prejudicial pretrial publicity. While he asserts that the publicity surrounding the murder of Mr. McGuire was prejudicial in itself, he alleges that "special circumstances" connected to his case led to far more damaging publicity.
On July 7, 1982, Deputy James W. Taylor was shot and killed at the Winston County Jail. The press in wide-spread and extended publicity, reported that authorities believed Deputy Taylor was killed by family and friends of the appellant during an attempt to free appellant from the jail, where he was awaiting trial for the McGuire murder. Appellant has not been arrested or charged for that incident.
Appellant argues that the publicity surrounding the murder and funeral of Deputy Taylor, and the widespread man hunt for his assailants, compounded the public prejudice already engendered by the publicity surrounding the McGuire murder. *Page 1376 
The defendant bears the burden of demonstrating that an impartial and fair trial, which will result in an unbiased verdict, can not be had at the present locale. A showing of actual prejudicial influence upon the jury must be made by the defendant to warrant a finding of error in the trial court's refusal to grant a motion for a change of venue. The ruling of the trial court on such motion will not be disturbed on appeal absent a showing of abuse of discretion. Ex Parte Magwood,426 So.2d 929 (Ala. 1983).
The existence of widespread publicity alone does not indicate that a defendant can not receive a fair trial. Anderson v.State, 362 So.2d 1296 (Ala.Cr.App. 1978); Magwood v. State,426 So.2d 918 (Ala.Cr.App. 1982), aff'd, 426 So.2d 929 (Ala. 1983). Rather, it is the prejudicial effect of the publicity upon the venire, which has made an impartial trial and unbiased verdict impossible, that the appellant must demonstrate to the trial judge. Speigner v. State, 367 So.2d 590 (Ala.Cr.App. 1978), cert. denied, 367 So.2d 597 (Ala. 1979). The proper manner for ascertaining whether adverse publicity has biased the prospective jurors is through the voir dire examination.Anderson, supra.
Our review of the jury's voir dire is guided by the following statements in Murphy v. Florida, 421 U.S. 794, 799,95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975):
 "The constitutional standard of fairness requires that a defendant have `a panel of impartial, "indifferent" jurors.' Irvin v. Dowd, 366 U.S. [717], at 722 [81 S.Ct. 1639 at 1642, 6 L.Ed.2d 751 (1961)]. Qualified jurors need not, however, be totally ignorant of the facts and issues involved. `To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' (Citations omitted)
 "At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate `The actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'"
As the United States Supreme Court stated in Murphy, supra, and reaffirmed in Dobbert v. Florida, 432 U.S. 282,97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), neither extensive knowledge of the defendant nor of his criminal activities is sufficient alone to establish the impossibility of a constitutionally fair trial. Absent a trial atmosphere which is utterly corrupted by inherently prejudicial press coverage, unfairness and prejudice of a constitutional magnitude will not be presumed on appeal. There must be some affirmative showing by appellant of a connection between the publicity generated by the news media and the existence of actual jury prejudice. Dobbert, supra;Anderson, supra.
With these standards in mind, we now focus on the question of whether the appellant demonstrated at trial that the prospective jurors were unable to lay aside any prejudicial impressions or opinions they may have formed as a result of the publicity surrounding the case.
The first indicium of prejudice created by pretrial publicity referred to in brief by appellant appears in the record as follows:
 "THE COURT: Mrs. Denton, did you respond to that question?
 "PJ DENTON: No. I said I knew part of the family, and I was afraid I would have a fixed opinion."
It is clear that prospective juror Denton's reply indicated it was her personal knowledge of the family, and not publicity about the case, which might affect her decision. Appellant's argument is not supported by this juror's answer.
The second reference to the voir dire appears as follows:
 "MR. MCDONALD: Do you recall reading or seeing something or hearing something about something that — *Page 1377 
 "PJ ATCHLEY: That happened this summer, yes. Everybody read it.
"MR. MCDONALD: Ma'am?
"PJ ATCHLEY: Almost everybody read it."
Appellant also asserts in brief that only four potential jurors were unaware of the bridge murder, and only six were unaware of Deputy Taylor's murder. As previously stated, even extensive knowledge of the appellant and his criminal activity is not sufficient in and of itself to establish error in the trial court's ruling.
The third reference by appellant reflects the following:
 "MR. MCDONALD: Please search your memory. Regardless of what you heard, what you read, what you saw, did you, at that time, or any time between then and now come to a conclusion of guilt on anybody's part? Not asking you what you're feeling now. I'm talking about at that time, did you entertain some thought process that ended up in your mind as guilt or innocence of the persons arrested? Nobody did? Everybody had an open mind right then and had all the way through?
"PJ OWNBY: (Raises hand.)
"MR. MCDONALD: Yes, ma'am?
 "PJ OWNBY: When I heard it on T.V. I thought that's just another crime that goes on all the time, and I sort of thought if he was guilty he needed to be punished, but if he's not — that's the way I feel. You hear so much that you sort of feel that way.
 "MR. MCDONALD: All right. That's a healthy way to approach it, and I'm not saying the other way is not. I mean, we're all human, and we have these straights [traits?], and I'm just trying to find out if any of us here has any kind of — Mr. Ford, you shook your head negative when I was asking the question.
 "PJ FORD: Well, the morning that I heard about this alleged thing you're talking about — I mean, I work here every day.
"MR. MCDONALD: I understand.
 "PJ FORD: And when I heard it on the news on the way over here, and when I got here I walked out where it happened. The man was a friend of mine."
Potential juror Ownby's comment indicated no bias or prejudice against appellant which she could not lay aside in order to render a verdict based on the evidence presented at trial. She, at most, appears to state that if appellant was guilty he should be punished, but if not guilty, he should not be punished.
Potential juror Ford's answer again indicated no bias created by the news media, but a potential personal bias based upon his friendship with Deputy Taylor.
Appellant's final reference is as follows:
 "MR. MCDONALD: I'm going to ask two questions that may be the same way and maybe it won't: Did anyone come to any mental conclusion on the part of this defendant at any time between the instant you first started reading it and now?
"PJ SMITH: I did.
"MR. MCDONALD: Yes, sir?
 "PJ SMITH: I said guilty when I first read the thing, and I thought, well —
"MR. MCDONALD: You had a conclusion at that time?
"PJ SMITH: Yes, I did when I read it.
"MR. MCDONALD: Anyone else."
. . . .
 "Did any of you entertain mentally the thought that whoever was in the second incident or the subject matter of the second incident was guilty of the first incident? Anybody?
"(Hands raised.)
 "MR. MCDONALD: Mr. Rivers and Mr. Tittle. Anyone else?"
Following those answers, the State made the following inquiries:
 "MR. TIDWELL: Mr. Smith, I believe, and Mr. Rivers and Mr. Tittle, these questions are to you: Do you all still feel, even you have gone through a thought process or a conclusion or whatever they are talking about, do you feel at this time today that you, if you were selected to sit *Page 1378 
on this jury to render a fair and impartial decision based on the evidence that comes from the witness stand in this case, do you think you could? Mr. Rivers?
 "THE COURT: Mr. Tittle? Start with the one — Al, I can barely hear you myself. Maybe I'm getting hard of hearing. I guess I am. Call out the Juror's names.
. . . .
 "MR. TIDWELL: You say you could render a fair and impartial decision based on the evidence and the law given to you by the Judge?
"PJ TITTLE: Yes, sir.
 "MR. TIDWELL: Mr. Rivers, do you feel like you could do that?
"PJ RIVERS: Yes, sir.
 "MR. TIDWELL: Okay. And Mr. Smith? I'll get your name here eventually, Mr. Smith. Do you feel like you could render a fair and impartial decision?
"PJ SMITH: I believe. You know, right then I didn't.
 "MR. TIDWELL: I'm talking about today. Today if you were chosen to sit on this jury, do you feel like you could render a fair and impartial decision in this case based on the evidence that comes from the witness stand and on the law the Judge will charge you at the end of the case?
"PJ SMITH: Yes.
"MR. TIDWELL: Okay. Thank you. That's all, Judge."
The answers above indicate there existed no hostility toward appellant which suggested a partiality among the jurors that could not be laid aside in rendering a fair and unbiased verdict. Speigner, supra.
We have reviewed the entire jury venire voir dire as well as those portions of the jury venire voir dire to which appellant has directed us in brief. As well, we have carefully reviewed all of the news articles included as exhibits in the record. We find the vast majority of the news articles to be strictly factual in nature and non-inflammatory in character. Magwood v.State, supra. One editorial and one account of Deputy Taylor's funeral are included which are somewhat less factual. Their thrust is toward the deplorability of the death of a law enforcement officer and the desire that such assailants be quickly punished. Appellant is not mentioned by name in either article. We find that both articles are reasonably free from any call for action based upon emotional subjective judgments.Coon v. State, 380 So.2d 980 (Ala.Cr.App. 1979), aff'd,380 So.2d 990 (Ala. 1980), rev'd on other grounds, 405 So.2d 704
(Ala.Cr.App. 1981).
The record contains no showing by appellant of any actual prejudice against appellant such as would render it reasonably unlikely that appellant could secure a fair trial and an impartial verdict. Magwood, supra. We find no abuse of discretion in the trial court's refusal to grant a change of venue.
 II
Appellant argues that an "inflammatory" comment by the prosecutor during closing argument should have resulted in the trial court's declaring a mistrial. The comment appears as follows:
 "MR. SNODDY: The most important thing, I want you to remember that it could have been your father, your brother, your son or anyone else.
 "MR. MCDONALD: He's putting the jurors in the position of the parties, may it please the Court, and we are going to have to object to it and we want to make a motion if you will consider it timely and we'll do it later.
 "THE COURT: All right. The objection is sustained. Don't argue other than this case."
Prejudicial statements, even though improper, may be eradicated by the trial judge in sustaining objections thereto, or by instructions to the jury or both. Meredith v. State,370 So.2d 1075 (Ala.Cr.App.), cert. denied, 370 So.2d 1079 (Ala. 1979).
Here, the trial court immediately sustained the appellant's objection. There is no indication that the prosecutor attempted repetition of the improper argument. *Page 1379 
Any error, therefore, was cured by the trial court's ruling in sustaining appellant's objection. Thompson v. State,352 So.2d 37 (Ala.Cr.App. 1977); Vickerstaff v. State, 374 So.2d 443
(Ala.Cr.App. 1979). There was no request that the remark be excluded from the jury's consideration. We do not view the remark to have been of such a prejudicial nature as to have been ineradicable by proper instruction had corrective action been requested. Hipp v. State, 47 Ala. App. 580, 258 So.2d 920
(1972); Richardson v. State, 354 So.2d 1193 (Ala.Cr.App. 1978). Appellant's motion for mistrial on this ground, which was made after the closing arguments by both sides was completed, was properly denied.
 III
Appellant argues that the trial court erred in charging the jury on intentional killing during the course of a robbery, as charged in the indictment, in that the State's evidence failed to prove all of the elements of the crime charged. He asserts that the evidence failed to show that the intentional killing was aggravated by robbery, or attempts thereof. Therefore, he argues the State only proved a "simple, unaggravated murder."
Appellant appears to argue that it is not logically possible for the murder weapon which was taken from the victim by the assailant to also be the property which is the subject of the robbery element of the capital crime. Thus, only if the assailant took the weapon and then used it as a means of force to rob the victim of other property, could a case of capital murder be established. We disagree.
We do not view this issue as a question of whether a murder weapon may also be the subject property for robbery. Rather, the question involves the element of the appellant's intent in depriving the victim of his property, i.e., the weapon, at the time of the crime.
Robbery, as defined in §§ 13A-8-40 through 13A-8-43, Code of Alabama 1975, includes those instances where force or violence is used or threatened "in the course of committing a theft." See Commentary to Ala. Code §§ 13A-8-40 through § 13A-8-44
(1975). Theft of property may be committed under § 13A-8-2, Code of Alabama 1975, when one "(1) knowingly obtains or exerts unauthorized control over the property of another, with intentto `deprive' the owner of his property; . . ." (Emphasis added). The definition of to "deprive," as here applicable is:
 "a. To withhold property or cause it to be withheld from a person permanently or for such period or under such circumstances that all or a portion of its use or benefit would be lost to him; or
 "b. To dispose of the property so as to make it unlikely that the owner would recover it; . . ." Ala. Code § 13A-8-1 (2) (1975).
Whether or not appellant intended to deprive the victim of the knife, as deprive is defined under § 13A-8-1 (2), was a question for the jury, which they resolved against appellant.Marvin v. State, 407 So.2d 576 (Ala.Cr.App. 1981); Craig v.State, 410 So.2d 449 (Ala.Cr.App. 1981).
Prior to the fatal attack, appellant expressed a specific interest in the victim's knife by questioning the victim about the weapon and its use by the victim. Appellant then rushed up to the victim and grabbed the knife from his pocket. After stabbing the victim with the knife, appellant again made a specific effort to retrieve the knife from the pavement and carry it away with him as he fled. We find that sufficient evidence was presented to require that the question of appellant's intent in taking the knife be submitted to the jury. As well, the evidence was sufficient for the jury to reasonably infer that a robbery, as charged to appellant, was committed. Marvin, supra; See, Taylor v. State, 48 Ala. App. 443, 265 So.2d 886 (1972) (police officer's pistol taken during struggle with appellant sufficient facts to charge on robbery and included offenses).
 IV
Appellant contends the trial court erred in failing to charge the jury on the lesser *Page 1380 
included offenses of manslaughter and criminally negligent homicide.
At the conclusion of the trial court's oral charge, appellant orally requested that the trial judge charge on the above referred to lesser offenses. The record, however, does not reflect that the charges were requested in writing as required when the objection is to the court's omission to charge. Hollisv. State, 399 So.2d 935 (Ala.Cr.App. 1981). The charges were properly refused for this reason alone. Thigpen v. State,369 So.2d 291 (Ala.Cr.App. 1978), cert. denied, 369 So.2d 297 (Ala. 1979); Kelly v. State, 338 So.2d 1047 (Ala.Cr.App. 1976).
Additionally, while appellant contends in brief that the charges on the lesser offenses were warranted by his theory that the victim was pushed onto the knife, we find no evidence in the record whatsoever to support his contention. The State's evidence made out a prima facie case of an intentional killing and was in no wise refuted by appellant at trial. In fact, the evidence indicates appellant thrust the knife into the victim with such force that it bruised the skin above the wound. The requests for instructions on the lesser offenses were properly refused in the absence of any rational basis to support them.Chavers v. State, 361 So.2d 1106 (Ala. 1978); Thomas v. State,418 So.2d 921 (Ala.Cr.App. 1981).
 V
Appellant urges this court to find that the trial court erred to reversal in allowing the State to argue to the jury during closing argument that life without parole is an alternative punishment to death for one convicted of a capital offense. The record reflects the following occurred during the State's closing argument in rebuttal:
 "Of course, Mr. McDonald went into the ramifications, some of the ramifications of this, but I just want to put down what I have. Of course, you know, what I'm telling you now is what I think the Judge will charge you relative to the law, and it's not a complete statement of that. Of course, that is not my function, and it's not appropriate for me to try to tell you or give you a complete statement of what the law is. But I do want to make just a few comments about what I think the Judge will charge you.
 "(Writing on board.) Now, one, would be capital — guilty of capital crime.
 "Now, by `Capital crime,' we mean that crime that is set out in the statute headed `Capital Crime.'
 "Now, of course, Mr. McDonald in his closing argument gave you a very vivid description of one of the alternatives there, and that is the death penalty. (Writing on board.) But there is another aspect or facet of the capital crime that we are considering here this week. That is —
 "MR. MCDONALD: Of course, we object to this, may it please the Court, and we'll assign our grounds later along with our other motions.
 "MR. TIDWELL: Well, Your Honor, we would state for the record and would like to have leave at a later time to state at length for the record relative to what was said by counsel in his —
"THE COURT: Are you saying it is —
 "MR. TIDWELL: His closing argument such that ours is at least —
"THE COURT: The objection is —
 "MR. MCDONALD: We would just say in the record what he said in his opening statement is what we were interested in, may it please the Court.
 "THE COURT: All right, sir. The objection is overruled and you have leave, both of you have leave.
"MR. MCDONALD: We except.
 "MR. TIDWELL: Then the other thing that is a possible consideration or alternative under the capital crime statute, if he is convicted of that, is life without parole. (Writing on board.)
 "Now, this is the second thing I expect the Judge to charge you as one of the possible verdicts.
 "Now, these are both, death penalty and life without parole, are incorporated under the verdict capital crime, guilty of a *Page 1381 
capital crime, if you decide that the State has met its burden of proving that to you beyond a reasonable doubt and to a moral certainty.
 "The other thing, murder, that's the second alternative, the third alternative, of course, is not guilty. (Writing on board.)
 "Now, those are the things I expect that will be your alternatives. One, a capital crime; two, just plain old murder which is a noncapital crime; and three, not guilty, but the significant thing for my purpose of describing this to you is that within the capital crime verdict that you will consider, that doesn't necessarily mean the death penalty. It could also mean life without parole.
 "MR. MCDONALD: May we have a continuing objection so we don't have to interrupt?
"THE COURT: Yes, sir."
After the completion of closing arguments, appellant made the following motion:
 "MR. MCDONALD: Yes, sir. We want to object to the argument. Well, first, we objected and we asked His Honor if we could make this motion timely, and that was to —
"THE COURT: To the final argument?
. . . .
 "MR. MCDONALD: Secondly, we object to the argument of Mr. Tidwell and wherein he gave the jury the law, not in the nature of this is what we expect the Judge to charge you, but did even write on the blackboard.
. . . .
 "MR. MCDONALD: All right. AA, the thing that says `possible verdicts,' and under it, `Number One, Capital Crime,' and he comments a number of times. I'll rely on the record, and I did see the court reporter taking it about the capital crime. We submit there are many, many capital crimes of which this defendant is not charged with but one, and he gave the potential punishments under it, one being `death penalty,' and one, `life without parole.'
 "We submit that not only is that improper coming from the District Attorney but even if it were allowable, then when you gave the punishment of only one of the things they are going to be charged with and not give the punishment of all of them to the jury for their consideration, it is doubly —
"THE COURT: Excuse me. You're relating to murder now?
 "MR. MCDONALD: Yes, the second thing on the board which says, `Capital Crime, Number One; Murder, Number Two; and Not Guilty, Number Three,' and we ask for a mistrial for that improper —
"THE COURT: The motion is denied."
In reply to appellant's motion, the prosecutor asserted his argument had been a reply in kind to arguments made by the appellant and quoted appellant's counsel's argument as follows:
 "MR. TIDWELL: My best recollection was to the effect that if you find him guilty of this capital offense, that he will go to the electric chair, that they will send a large surge of current through his body, that his eyeballs will pop out of his head, that his body will be charred and that green smoke will come out of his mouth —
"MR. MCDONALD: Blue.
"MR. TIDWELL: Blue smoke will come out of his mouth.
"MR. MCDONALD: Ears and sockets.
 "MR. TIDWELL: Ears and sockets, and our position is, Your Honor, that having said that that we are entitled to reply in kind and state that with reference to the capital offense that the only punishment will not necessarily be the death penalty but that is only one of the two alternatives, the other alternative being life without parole.
"MR. MCDONALD: May I say something for the record?
"THE COURT: Yes, sir.
 "MR. MCDONALD: First, I want to say for the record that the State in the opening statement to the jury said, `Yes,' they *Page 1382 
were asking for the death penalty. Mine was in response to that. The Defendant takes that position.
 "That part about the electric chair, it wasn't eyeballs bulging out. It was jumping out, being knocked out by wave of electricity. I did say that and said it in this sense: I was talking about the — All of the witnesses saying that they remembered it better now than they did at that time a few hours later, and I said we did not want to make the mistake of giving him, sending him through that and then sometime later saying, `Excuse me. Our memory is better now than after another fifteen months has passed,' or words to that effect. I didn't say that's what was going to happen. I said, `We don't want that to happen.'
"THE COURT: All right. Is that all for the record?
"MR. MCDONALD: Yes, sir." (Emphasis added)
The gravity of charge and legal principles involved, to be presented in instructions to the jury, are matters within the proper scope of argument by counsel. Payne v. State, 261 Ala. 397, 74 So.2d 630 (1954). Counsel may argue law generally to the jury, subject to the control and guidance of the trial court. Counsel's arguments of law, however, are argument before and to the court itself, in that the jurors are not the judges of the law. Rather, the jury receives and applies the law as it is charged to them by the court. Van Antwerp v. State,358 So.2d 782 (Ala.Cr.App.), cert. denied, 358 So.2d 791 (Ala. 1978). The court in its charge did inform the jury of the range of punishment applicable to the crimes charged by the indictment. The argument would not, therefore, have been prejudicial to appellant. Gilbert v. State, 373 So.2d 1235
(Ala.Cr.App. 1979).
Appellant, however, argues that there is a uniquely prejudicial effect in such statements by the prosecutor when they are made in a capital case. He asserts such statements have the effect of "easing the burden of the jury" and inducing the jurors to disregard their responsibility by injecting the consequences of the verdict into their decision, when, as here, those consequences potentially lessen the seriousness of the jurors' task.
Appellant cites no authority which supports this proposition as it relates to the bifurcated procedure established for capital felony trials under Beck v. State, 396 So.2d 645 (Ala. 1980). Clearly, the central issue in the guilt phase of the trial is whether the State has proved that the defendant is guilty of a capital crime. Beck, supra. And it is important that the jury's attention not be diverted from the central issue of guilt or innocence to the issue of punishment. Beck, supra, at 662, n. 9. It does not necessarily follow therefrom, however, that the jury may not be acquainted generally with the applicable state law involved in the capital felony trial process, including potential punishments. Rather, it appears that care should be taken only to avoid diverting the jury's deliberations from the central issue of guilt, to the issue of sentence, by such general instructions on the applicable law. While they are not technically applicable to the law under which appellant was tried and convicted, we find the Alabama Supreme Court's newly promulgated Pattern Jury Instructions for Use in Capital Cases Tried Under Act No. 81-178 (§§ 13A-5-39
through 13A-5-59, Code of Alabama 1975) instructive and persuasive in this matter. The seventh of the nine enumerated "General Considerations" contained therein appears as follows:
 "The trial judge should consider giving the following instruction or one similar to it, either at the beginning of the guilt stage trial, or at some place during the oral charge to the jury at the end of guilt stage, or both:
 "The defendant in this case is charged with having committed a capital offense. A capital offense is an offense for which the punishment is either life imprisonment without parole or death. The law provides that if a defendant is convicted of a capital offense additional proceedings will be held to determine whether his punishment is to be life imprisonment *Page 1383 
without parole or death. But you are not to concern yourself at this time, with any issue of punishment. Instead, the only determination you are to make at this time is whether the state has proven beyond a reasonable doubt that the defendant is guilty of the capital offense (or of some lesser offense or offenses which I will instruct you about later.)"
The following quote from the court's charge to the jury is the only reference to the potential punishments made by the trial judge:
"Now, there is in this case as in every serious offense, that is, a felony charge, a charge for which the punishment is imprisonment in the penitentiary and that starts at a year and a day sentence and runs on up, of course, to life in prison and life in prison without parole and death in the electric chair as in a capital charge. But every serious charge of that kind has to be brought to trial first by the finding of an indictment by a grand jury."
We do not view this statement to have been of such a nature as to have diverted the jury's attention from the central issue of guilt.
While we also do not find that the prosecutor's comments, quoted supra, impermissibly diverted the jury's attention from the issue of guilt, it is unnecessary for us to make that determination to resolve this issue. We think the trial court was justified in overruling appellant's objection and motion for mistrial because the prosecutor's argument could correctly have been viewed as a reply in kind to appellant's argument to the jury that "if you find him guilty of this capital offense, that he will go to the electric chair. . . ." See, Grady v.State, 391 So.2d 1095 (Ala.Cr.App. 1980). Appellant did not dispute the prosecutor's quotation of his statement to the jury, although he denied its intended impact was to indicate that the death sentence was inevitable upon conviction of the capital crime. We believe the thrust of appellant's argument, as quoted by the prosecutor, could have impressed the jury that death by electrocution was the only possible sentence, and it was proper for the prosecutor to argue the possibility of the alternative sentence of life imprisonment without parole to the jury. Grady, supra; Ellis v. State, 38 Ala. App. 379,86 So.2d 842 (1955), cert. dismissed, 264 Ala. 695, 86 So.2d 846 (1956).
Even assuming that the prosecutor had stated in opening argument that the State was seeking the death penalty, it would not have warranted the appellant's counsel in arguing as a reply in kind, that death was the only possible sentence for the capital offense.
 VI
Appellant contends there was a fatal variance between the indictment and the jury verdict, citing Whisenhant v. State,370 So.2d 1080 (Ala.Cr.App.), cert. denied, 370 So.2d 1106
(Ala. 1979), as authority. The verdict in the instant case appears in the record as follows:
 "`We, the jury, find the Defendant, Billy W. Crowe, guilty of the capital offense as charged in the indictment. J.O. Brown, Foreman.'" (R. 504)
The indictment, omitting its formal parts, is set forth below:
 "BILLY W. CROWE, whose name is otherwise unknown to the Grand Jury, did feloniously take, or attempt to take a hunting knife, of the value of Fifteen Dollars ($15.00), the personal property of JAMES McGUIRE, from his person and against his will, by violence to his person, or by putting him in such fear as unwillingly to part with the same, and in the course of said robbery, or attempt to rob, the said BILLY W. CROWE intentionally killed the said JAMES McGUIRE by taking his hunting knife away from him and stabbing him with the same, in violation of Section 13A-5-31 (2) of the Code of Alabama." (R. 2)
The indictment, in summary fashion so as to omit formal parts, was read to the jury by the trial court during the oral charge as appears below: *Page 1384 
 "Now, the indictment is in form that which charges a particular capital offense, and that's what's written down on here, but there is a lesser included offense of murder.
 "Now, let me distinguish and explain and define those two offenses to you. First of all, referring to the indictment in summary fashion, it charges that Billy W. Crowe did feloniously take a hunting knife, the personal property of James McGuire, from his person and against his will by violence to his person or by putting him in such fear as unwillingly to depart with the same and in the course of said robbery the said Billy W. Crowe intentionally killed the said James McGuire by taking his hunting knife away from him and stabbing him with the same." (R. 483)
As in his preface to reading the indictment quoted above, the trial judge throughout his oral charge informed the jury that appellant was charged by the indictment with having committed a particular "capital offense." During the court's charge to the jury as to verdict form the following appears:
 "If after carefully considering all of the evidence in the case it is your decision that the State of Alabama has met its burden of proof as I have defined that to you on the capital offense charged in the indictment, then your verdict should be in this form: `We the jury find the defendant, Billy W. Crowe, guilty of the capital offense as charged in the indictment.'" (R. 491)
The court, in charging the jury, and in formulating the guilty verdict form quoted above, followed the express language adopted in Beck, supra, for denominating the jury's verdict during the guilt phase of the trial. His oral charge and verdict form in this regard, were therefore correct. There was no variance between the indictment, the court's oral charge, and the verdict returned by the jury. "The jury, by bringing back the general verdict of guilty, in full compliance with the trial judge's instructions, convicted the appellant of the very crime charged in the indictment. Ex Parte Clements v. State,370 So.2d 723 (Ala. 1979)." Johnson v. State, 399 So.2d 859
(Ala.Cr.App.) aff'd in part, rev'd in part, 399 So.2d 873 (Ala. 1979); See, Waldrop v. State, 424 So.2d 1345 (Ala.Cr.App. 1982).
We note that Whisenhant, supra, cited by appellant, involved a jury verdict which found the defendant guilty of "capital murder." As well, that decision applied reasoning which was overruled in Beck by its determination that the gravamen of the capital offense is an "intentional killing with aggravation, and not some crime other than homicide under aggravated circumstances." Beck, supra at 662.
The attorney general points out in brief also that both this court and the Alabama Supreme Court have tacitly approved such jury verdict form language by affirming capital cases in which the form of the verdict followed that of the verdict in the instant case, citing Clisby v. State, [Ms. 6 Div. 576, Mar. 2, 1982] (Ala.Cr.App. 1982), affirmed, Ex Parte Clisby [Ms. 81-633, Feb. 11, 1983] (Ala. 1983), and Raines v. State, 429 ___ (Ala. 1983), and Raines v. State, 429 So.2d 1104
(Ala.Cr.App. 1982), aff'd, 429 So.2d 1111 (Ala. 1982).
No error harmful to the substantial rights of appellant having been demonstrated on appeal, this case is affirmed.
AFFIRMED.
All the Judges concur.