[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 905 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 906 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 907 
The appellant, Timothy Jason Jones, was convicted of two counts of capital murder for the killings of his parents, John Timothy Jones ("Tim") and Nancy Stewart Lazenby Jones ("Nancy"). The murders *Page 908 
were made capital because the appellant committed them during the course of a robbery or an attempted robbery. See §13A-5-40(a)(2), Ala. Code 1975. He was also convicted of an additional count of capital murder, pursuant to §13A-5-40(a)(10), Ala. Code 1975, because he killed Tim and Nancy by one act or pursuant to one scheme or course of conduct. After a sentencing hearing, by a vote of 10-2, the jury recommended that the appellant be sentenced to death. The trial court followed the jury's recommendation and sentenced the appellant to death. The appellant filed a motion for a new trial, which was deemed denied by operation of law. See Rule 24.4, Ala. R.Crim. P. This appeal followed.
The appellant raises several arguments on appeal that he did not raise at trial. Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy,472 So.2d 1106 (Ala. 1985). Rule 45A, Ala. R.App. P., provides:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review . . . whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'"United States v. Young, 470 U.S. 1, 15,105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v.Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14,71 L.Ed.2d 816 n. 14 (1982)).
The State presented the following evidence during the guilt phase of the trial:
Cathy Fountain testified that, in January 2004, she worked at a doctor's clinic and had worked as a nurse for Tim for seven years; that Tim saw patients at the clinic and usually arrived any time between 7:30 a.m. and 9:00 a.m.; and that Tim saw patients at the hospital before he went to the clinic. She also testified that, on January 29, 2004, she became concerned when Tim had not arrived by 9:15 a.m. because he always telephoned her if he was going to be late. She checked, and none of the other doctors and no one at the hospital had seen him. She also telephoned his residence, but got an answering machine. Ultimately, about 9:30 a.m., she telephoned the police department.
Chief Rudolph Munnerlyn of the Monroeville Police Department testified that his department received a call requesting that someone check on Tim; that he and Officer Brian Cantrell arrived at the Jones residence at approximately 10:00 a.m. on January 29, 2004; that Cantrell knocked on the front door, but did not get a response; and that they checked all of the doors and did not see any signs of a forced entry. He also testified that he went back around the house and checked the carport/garage door again and "noticed a fresh mark like the door had been damaged," looked to the side and "saw the pile of debris and the white blanket with the red spots," and saw Tim's day planner; that he walked around a vehicle that was parked there and saw Tim's hand; that he moved enough material to see Tim's face; and that he left the carport/garage and called for more law enforcement officers to come to the scene. (R. 233.)
Munnerlyn testified that he smelled the strong odor of gas at the back of the residence and called for the fire department to come to the scene; that, after Monroe County Sheriff Thomas Tate arrived, they noticed that a grill on a deck *Page 909 
was leaking gas; that they went around the deck and saw what they thought might be a body in the bedroom; and that they got the fire department to help them enter the residence. When they got to the bedroom, he saw what appeared to be a bloody bone on the floor. The sheets were pulled back and revealed Nancy's body.
Monroe County Sheriff Thomas Tate testified that he went to the Jones residence at Munnerlyn's request; that he went into the carport, moved some covering, and saw Tim's body; that they decided that they needed to determine whether anyone else was in the residence; and that they went onto a deck, looked into the master bedroom, and saw what appeared to be a body under the cover on the bed. At that point, they got fire department personnel to let them into the house so they could check the condition of the body on the bed and determine whether anyone else was in the residence. When he pulled back the covers on the bed in the master bedroom, he found Nancy's dead body. Tate also testified that there were blood spatters in the kitchen area on either side of a bar area and that they could have indicated a trail from the kitchen into the carport and a trail into the bedroom.
Elise Hicks testified that she was Tim's sister; that she telephoned the Jones residence around 6:55 a.m. on January 29, 2004; that the appellant answered the telephone; and that she told him she would call back later.
Jacquilyn Nobles testified that, between 9:30 a.m. and 10:00 a.m. on January 29, 2004, she telephoned the Jones residence and did not get an answer. Afterward, she telephoned Nancy's cellular telephone, and the appellant answered and told her he was on the way to Mobile.
Allison Burns testified that she and the appellant met in a rehabilitation center in September 2003; that, when they got out of the center, they stayed in Birmingham for a few weeks and then moved to the victims' condominium in Destin, Florida; that she moved back to Muscle Shoals in January 2004, and the appellant came there and stayed in a hotel for about one week; that Nancy went to Muscle Shoals on January 27, 2004, and she and the appellant drove back to Monroeville on January 28, 2004; and that Nancy and the appellant arrived in Monroeville around 5:00 p.m. She also testified that she thought she talked to the appellant only one more time that night and that he told her he was going to Kim Stabler's house; that, starting at 9:00 p.m. or 9:30 p.m., her caller identification on her telephone showed that the appellant called her house every thirty minutes, but she was not home; that the appellant had said something about going back to rehabilitation; that the appellant did not ever mention going back to Muscle Shoals; that an ex-boyfriend was going to get out of jail shortly thereafter, but she did not remember discussing that with the appellant that day; and that the appellant did not sound intoxicated when she talked to him. Burns testified that the appellant telephoned her throughout the night of January 28, 2004, and into the day on January 29, 2004; that the calls "started at . . . Kim's, and then his parents' house, and then his grandmother's house, and then his house again, and then from [Nancy's] cell phone"; and that, late in the afternoon, he said he would be at her house shortly. (R. 403.) She further testified that, when the appellant arrived, he was driving Nancy's Mercedes; that she eventually got into the vehicle with him, and law enforcement officers drove up; and that the appellant drove through the yard and stopped to let her get out of the vehicle.
Burns testified on cross-examination that she understood that the appellant *Page 910 
started using cocaine almost as soon as he left the rehabilitation program; that she and the appellant started drinking alcohol the day she left the rehabilitation program; that, after they moved to Destin, the appellant went on binges where he used cocaine for days at a time; and that the appellant had been on a binge before Nancy went to Muscle Shoals to get him.
Kim Stabler testified that she was a friend of the appellant's and had known him for about fifteen years. On the evening of January 28, 2004, she picked up the appellant at his parents' residence to get him to work on her computer, and Nancy requested that she call if she was going to bring the appellant home later. On the way to her house, they went to a liquor store, and the appellant bought a fifth of vodka and spoke to someone. The appellant identified the person as Tyron and told her he owed Tyron $600.
While he was at Stabler's house, the appellant worked on her computer; spoke on the telephone to Burns; drank vodka; and took some Klonopin pills. He told Stabler he was concerned about Burns because her ex-boyfriend, who had been violent in the past, was getting out of jail the next day; told her he wanted to go back to Muscle Shoals; and asked her to take him to his parents' residence to get a Blazer. She refused to take him to his parents' residence that night, told him to stay at her house that night, and told him they would find a way to get him to Muscle Shoals the next day. However, around 5:15 a.m. the next day, she discovered that the appellant had left, and she called Tim to let him know and to make sure everything was okay. Finally, Stabler identified a sweatshirt that law enforcement officers later recovered from the Jones residence as one she had previously given the appellant.
Stabler testified on cross-examination that the appellant was drinking and feeling the effects of alcohol while he was at her house during the evening of January 28, 2004; that she had known the appellant to take both illegal and prescription drugs; and that the appellant had been in several drug and alcohol treatment programs.
Nathaniel Tyron Howard testified that he saw the appellant at a liquor store on January 28, 2004; that the appellant had two half gallons of gin; and that they spoke. He also testified that the appellant telephoned him after midnight that night, told him he was out in the cold, and asked him to pick him up and take him home; that, when he picked him up, the appellant had been drinking; and that, close to 1:00 a.m., he dropped the appellant off at the Jones residence. Sometime after 1:00 a.m., the appellant telephoned him again; told him his parents did not want him to stay at their house that night because he had been drinking; said he was going to have to leave; and asked for a ride, but Howard refused. Howard also testified that, around 6:20 a.m., the appellant arrived at his mother's house driving Nancy's Mercedes; that the appellant said that Nancy had given him the Mercedes; that the appellant asked him to go to North Alabama with him; and that the appellant said that his girlfriend's ex-boyfriend was getting out of jail, that the ex-boyfriend was going to hurt her, and that he wanted to go get her.
Officer Brian Keith White of the Monroeville Police Department testified that, around 1:21 a.m. on January 29, 2004, he responded to a call at the Jones residence about a person who would not leave; that the appellant was in the yard talking on a cellular telephone; that Officer Geraldine Owens was inside talking to the victims; that Owens came out, talked to the appellant, told him they would take him to the *Page 911 
Winn Dixie shopping center, and told him to put down a knife he had; and that the appellant was taken to the Winn Dixie shopping center. He also testified that he heard some discussion about the appellant wanting a Blazer to go out of town and about the victims refusing to let him have the keys to it. Between 3:00 a.m. and 3:15 a.m. on January 29, 2004, Tim telephoned White and asked him to meet them at the Lazenby residence, where Nancy's parents had lived before they died. On his way, he saw the appellant at a pay telephone at a nearby convenience store. About 3:15 a.m., the victims arrived at the convenience store; the appellant got into their vehicle; and they drove to the Lazenby residence and went inside. While they were there, the victims went to the controls for an alarm system, and the appellant asked them not to set it so he could not walk around and asked them if they were afraid he was going to steal the vehicle that was there. Tim then set the alarm and walked outside.
Sergeant Geraldine Owens of the Monroeville Police Department testified that, during the early hours of January 29, 2004, she responded to a call at the Jones residence; that the appellant was outside talking to Officer Micheal Davenport, and Nancy came out to meet her; that, after talking to Nancy, she told the appellant that the victims wanted him to leave the premises; that the appellant asked for a telephone to call for a ride, and Nancy got a cordless telephone for him; that they arranged to drop the appellant off at the Winn Dixie parking lot so someone could pick him up there; and that they retrieved and returned a knife the appellant had gotten from the kitchen.
Officer Michael Davenport of the Monroeville Police Department testified that he went to the Jones residence at approximately 1:16 a.m. on January 29, 2004; that the appellant was on the front porch and appeared to be nervous; that the appellant told him to stay back; that he stayed back and spoke to the appellant and backup arrived; and that he asked the appellant if he had been drinking, and the appellant said he had not. He also testified that, after about ten minutes, he took the appellant to the Winn Dixie parking lot to meet someone; that the appellant told him he wanted to get to Muscle Shoals and had mentioned Destin; and that the appellant finally said he had had two drinks.
Captain Donnie Aycock of the Muscle Shoals Police Department testified that he and Officer Ben Montgomery were assigned to observe the Burns residence on the afternoon of January 29, 2004; that they were looking for Nancy's Mercedes; and that he saw the vehicle between 4:30 p.m. and 4:45 p.m. in Burns' driveway. After confirming that it was Nancy's Mercedes and conferring with the Alabama Bureau of Investigation ("the ABI"), he and Montgomery pulled behind the vehicle in the Burns driveway; that the appellant drove across the yard and into the street; that the appellant stopped nearby, and Burns got out of the vehicle; that the appellant drove away quickly, and several vehicles pursued him at high rates of speed; that, at one point, they were driving more than 135 miles per hour; and that, after about ten minutes, the appellant wrecked, and officers took him into custody.
Captain David Hester of the Russellville Police Department testified that he arrived at the scene within minutes after the appellant wrecked the Mercedes; that a purse and a wallet were in the trunk of the vehicle; that the appellant appeared to be coherent and did not appear to be under the influence when he was subsequently taken to the emergency room; and that he *Page 912 
collected the appellant's blue jeans and shoes at the emergency room.
Corporal Mark McCormick of the ABI testified that he assisted in the search for Nancy's Mercedes on January 29, 2004; that he arrived at the accident scene around 5:00 p.m., which was a few minutes after the appellant wrecked the Mercedes; that, when he arrived, the vehicle's trunk was open and the driver's door was open; and that he performed an inventory search of the vehicle. In the passenger compartment, he found several items, including an American Express credit card issued to Tim Jones, an American Express credit card issued to Nancy Jones, a Visa credit card issued to J. Timothy Jones, a Visa credit card issued to Nancy L. Jones, $7 in cash, a cellular telephone, and two wallets. In the trunk, he found a wallet that had John Timothy Jones' driver's license in it and a purse that had Nancy Jones' driver's license in it. Neither the wallet nor the purse had any cash in it.
Agent Simon Benson of the ABI testified that he went to the Jones residence on the evening of January 30, 2004, and retrieved a sweatshirt from the computer room. He also testified that he, Munnerlyn, and Chief Investigator Terry Mason of the Monroe County Sheriff's Department interviewed the appellant; that they advised the appellant of his Miranda rights, and the appellant waived them; and that the appellant made two recorded statements.
In the first statement, the appellant told the officers that he drove a red Blazer to Monroeville from Muscle Shoals on January 28, 2004, and Nancy followed him; that they arrived about 5:30 p.m.; that he telephoned Stabler, and she invited him to spend the night at her house; that Stabler picked him up around 6:30 p.m.; and that, during the evening, they talked and played games and he repaired her computer and talked on the telephone to Burns. He explained that Burns wanted him to return to Muscle Shoals to get her, and he said he would; that Stabler wanted him to stay at her house that night, and he said he would; and that, once Stabler was asleep, he telephoned Howard to pick him up and drive him to his parents' residence. When he discovered that the red Blazer he had been driving was not at his parents' residence, he asked where it was and told them he needed it to go get Burns. However, they told him he could not have it, and an argument started. When his parents threatened to telephone law enforcement authorities in Florida because he had outstanding warrants, he said they would have to shoot him before they took him back to jail, and he got a knife. At that point, Nancy telephoned the Monroeville Police Department, and he went outside to wait for the police.
The appellant also said that, after the officers arrived, he telephoned Howard and arranged to meet him at Winn Dixie; that an officer took him to Winn Dixie; that he later walked to a convenience store and telephoned and asked Tim to come get him, but Tim refused; and that Tim finally agreed to meet him with law enforcement officers, to take him to his grandmother's house, to arm the alarm, and to let him spend the night there.
The appellant stated that, while he was at his grandmother's house, he thought about all of the trouble and pain he had caused his parents; that he decided that he could not do that any more; that he thought that, if he killed himself, he would just be putting his parents in more pain; that he did not want his parents to go through what they had been going through any more; that he did not know if he would ever quit using drugs; and that he decided that, if his parents were dead, they would not suffer any more. He telephoned *Page 913 
Tim and again asked him to let him go to Muscle Shoals, but Tim refused. Afterward, he went to the basement, got a pipe, and wrapped it with duct tape; got a knife from the kitchen; broke out a window so the alarm would not go off and cut his hand when he went out; and walked to his parents' residence.
The appellant also stated that he moved a trash can and a recycle bin so he would not wake up Nancy and waited by the carport door for Tim to come out to go to work; that, around 5:30 a.m. or 5:45 a.m., as soon as Tim came out of the door, he hit him in the head with the pipe; that Tim fell to his knees, and he kept hitting him; that Tim fell on his back, and he kept hitting him; that he kept hitting Tim as hard as he could because he did not want him to suffer; and that he knocked Tim out. He then became concerned that Nancy had heard him, went to her bedroom, and repeatedly hit her with the pipe. The appellant cheeked Tim and, when he found that Tim was still alive, he got the knife he had taken from his grandmother's house and tried to put it in Tim's heart so he would not suffer. He then went back and tried to put the knife in Nancy's heart and, when he could not, he cut her jugular vein.
The appellant said that, afterward, he washed his face and hands, got Nancy's purse and Tim's wallet, got in Nancy's Mercedes, and went to Howard's house and bought some crack. At some point, he remembered that he had left the knife on top of a vehicle and returned to the Jones residence. He stayed for a little while, got the knife, left around 8:30 a.m., took the pipe and knife with him, and headed toward Muscle Shoals.
The appellant stated that he took back roads toward Montgomery, used one of Nancy's credit cards to buy gas between Evergreen and Montgomery, got onto Interstate 65 and went to Birmingham, bought some crack in Birmingham, and smoked the crack on the way to Muscle Shoals. During the trip, he telephoned Burns using Nancy's cellular telephone, and she met him outside of her house when he got there. The appellant explained that he wanted to leave because he owed $200 to a drug dealer, that the dealer had been telephoning Burns to find out where he was and where she lived, and that they were going to get some money and pay the dealer so he would leave Burns alone. When he arrived, law enforcement officers pulled into the driveway. He drove across the yard with Burns in the vehicle, stopped briefly to let her out, headed toward the interstate, and ultimately wrecked the vehicle. At some point, he threw the pipe and knife into a swamp in the Muscle Shoals area.
The appellant told the officers that he got about $180 from his parents' wallets and spent all but $2. He also admitted that he did not have permission to leave in the Mercedes and that he took the keys from Nancy's purse.
In the second statement, the appellant told law enforcement officers that he covered Tim with mats and trash bags after he stabbed him and covered Nancy with a comforter after he cut her. He also told them that he went to Howard's house around 6:30 a.m. and bought $100 worth of crack. The appellant said that, after he returned from Howard's house, he went into the computer room at his parents' residence and smoked crack; that his Aunt Elise telephoned the Jones residence, spoke to him, and left a message for his parents; and that he later spoke to Nobles on Nancy's cellular telephone.
The appellant said that he was wearing a gray or black fleece pullover shirt at some time; that he got blood on the pull-over and his blue jeans; that he probably left the pullover at his parents' residence; *Page 914 
that he did not change clothes after he left his parents' residence; and that officers took his clothes and shoes after he was arrested. He also said that, when he spoke to Burns, she asked him how he got the vehicle, and he told her he stole it.
Dr. Kathleen Enstice, a forensic pathologist employed by the Alabama Department of Forensic Sciences, responded to the Jones residence at approximately 12:50 p.m. on January 29, 2004. She testified that she examined the place where Tim's body was found at 3:30 p.m.; that his body was covered by lawn and leaf bags, several small rugs, a blanket, a recycling container, and a garbage can; that she determined that he had been face down initially and had later been rolled over toward the back wall of the carport/garage; and that her examination of Tim's body showed that he had been dead between eight and twelve hours. During the autopsy of Tim's body, Enstice found at least twelve blunt force injuries to his head; portions of his skull that were shattered; a minimum of four external stab wounds to his chest and approximately twenty-six internal stab wounds; and numerous injuries to his hands. She testified that the cause of Tim's death was multiple blunt force injuries and multiple sharp force injuries. She also testified that Tim's injuries were consistent with him having been hit from behind with a metal pipe, knocked to his knees and hit in the back of the head, and then turned over and stabbed through the front of the heart.
Enstice testified that she examined the place where Nancy's body was found and performed an autopsy of her body. The autopsy revealed multiple blunt force trauma to her head; a broken jaw that was the result of a great amount of force; portions of her skull that were shattered; a portion of her tongue that was almost severed; and stab wounds to her head, neck, and chest. Enstice testified that the cause of Nancy's death was multiple blunt force injuries and multiple sharp force injuries. She also testified that Nancy's injuries were consistent with her having been hit with a metal pipe and stabbed with a knife.
Farron Brewer testified that he is a forensic biologist employed by the Alabama Department of Forensic Sciences; that he specializes in DNA profiling; that he found blood that was consistent with Nancy's on the sweatshirt that was recovered from the Jones residence and from the driver's side floormat in the Mercedes; and that he found blood that was consistent with Tim's on the appellant's blue jeans and tennis shoes and on the hood of the Mercedes.
The defense presented the following evidence during the guilt phase of the trial:
Dr. Thomas Bennett, a clinical psychologist, testified that the appellant has an extensive history of psychological problems that goes back to early adolescence; that he had been in numerous treatment facilities and had seen numerous treating professionals; that, around the age of nine, the victims told him he was adopted, and he started developing behavioral problems shortly thereafter; that he started drinking alcohol and using marijuana before the age of twelve and started using other drugs in early adolescence; and that he had taken a good many medications during his lifetime. At the age of sixteen, the appellant was admitted to Charter Hospital, and "that was the beginning of a string of psychiatric and substance abuse admissions." (R. 540.)
Based on his examination, Bennett concluded that the appellant had been psychologically disturbed and had engaged in many self-defeating behaviors for a number of years; that he had struggled with trying to develop an adult identity for years; and that he was experiencing the *Page 915 
effects of chronic drug abuse. He stated that, from the time of middle adolescence to the time of the offense, the appellant was either drugged or in treatment for being drugged; that the appellant's social and emotional development were more similar to a twelve- or thirteen-year-old than to any adult; and that the appellant functions more like an adolescent than an adult. Bennett also testified that there was evidence that the appellant had been depressed for many years, had chronic social problems, and had chronically abused drugs. As a result, he stated that the appellant had "apparently always had difficulty factoring in the criminality of his conduct." (R. 547.) Finally, Bennett testified that, at the time of the offenses, the appellant had difficulty weighing or thinking about the concepts of right and wrong.
Dr. C. Van Rosen, a clinical and forensic psychologist, testified that the appellant received psychiatric and substance abuse treatment on at least ten occasions during his lifetime; that the appellant started using alcohol and marijuana at age eleven or twelve and progressed to other drugs; and that he administered eight tests to evaluate the appellant. Based on his testing, he concluded that the appellant was profoundly disturbed and had a longstanding personality disorder; had polysubstance dependence; and had a depressive disorder. He stated that the appellant was very immature; that his judgment was like that of a seventeen- or eighteen-year-old; and that his personality disorder and mental deficiencies were very severe and very serious at the time of the offenses.
On cross-examination, Rosen admitted that he had concluded that the appellant was competent to stand trial and to waive hisMiranda rights. He also admitted that he had I not found any evidence that the appellant was significantly intoxicated at the time `of the offenses. Finally, he admitted that the appellant's ability to appreciate the wrongfulness of his actions was severely impaired at the time of the offenses, but that he probably knew that what he was doing was a crime and, "broadly speaking," knew the difference between right and wrong. (R. 587.)
The State presented the following rebuttal evidence during the guilt phase of the trial:
Dr. Doug McKeown, a licensed clinical and forensic psychologist, testified that he evaluated the appellant pursuant to orders by the trial court to determine his mental state at the time of the offense, his competency to waive his Miranda rights, and his competency to stand trial. Based on his evaluation, he concluded that the appellant was fully capable of assisting defense counsel and assuming the role of the defendant in a judicial proceeding; that the appellant understood, comprehended, and appreciated the Miranda warnings; that the appellant suffered from a long-term personality disorder, chronic use of and dependence on alcohol and various drugs, and some psychotic symptoms at times; and that, at the time of the offenses, the appellant was fully capable of appreciating, understanding, and comprehending his actions and behavior.
 I.
The appellant argues that he did not voluntarily make his inculpatory statements to law enforcement officers. Specifically, he contends that he "was coerced into giving his statements] to investigators by not being allowed to use the telephone to contact an attorney." (Appellant's brief at p. 9.)
 "It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. *Page 916 Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe [v. Connecticut], 367 U.S. [568,] 602, 81 S.Ct. [1860,] 1879, [(1961)], the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, `if his will has been overborne' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id.
(emphasis added).
 "The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872
(1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App. 1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App. 1978) (stating that the true test to be employed is "whether the defendant's will was overborne at the time he confessed') (emphasis added). Thus, to determine whether McLeod's confession was improperly induced, we must determine if his will was `overborne' by an implied promise of leniency.
 ". . . .
 ". . . Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm or hope of favor.' See Gaddy, 698 So.2d at 1154 (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala. 1988)); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."
McLeod v. State, 718 So.2d 727, 729-30 (Ala. 1998) (footnote omitted).
During the suppression hearing, the State presented the following evidence:
Dr. Doug McKeown, a licensed clinical psychologist, testified that, pursuant to an order by the trial court, he examined the appellant; that he interviewed the appellant, listened to the statement, and reviewed reports from law enforcement agencies; and that he concluded that the appellant was competent to waive his Miranda rights when he made his statement.
Edward Wells, a jailer with the Monroe County Sheriff's Department, testified that he came into contact with the appellant at the jail around 4:00 p.m. on January 30, *Page 917 
2004; that the appellant was placed in a cell by himself; and that he was responsible for the care, custody, and control of the appellant. He also testified that, around 6:00 p.m., when he went by the appellant's cell while he was making his rounds, the appellant asked if Chief Jernigan and the investigators were still there, and he said that they were not; that the appellant said, "`Well, you need to tell them if they want to know what happened, they better get up here now before it's too late'"; that he notified the dispatcher to contact one of them; and that he later took the appellant to a deputy's office for the interview. (R. 122.) Wells further testified that he did not threaten the appellant at any time, promise him anything, or tell him that he would be better off if he made a statement. Finally, he testified that the appellant did not ever tell him that he wanted to talk to a lawyer.
On cross-examination, Wells testified that the appellant was on suicide watch; that there was a telephone in his cell; that jail authorities could control when the telephone was on and off; and that they normally turned the telephones on at 8:00 a.m. and turned them off at 9:00 p.m. each day. He also testified that, when the appellant got into his cell around 4:30 p.m., Chief Jernigan told him to turn the telephone on; that his daily log indicated that the appellant was with deputies at 4:58 p.m.; that, at 5:41 p.m., Chief Jernigan told him to turn on the telephone in the cell; that, when he checked on the appellant at 6:00 p.m., he was in his cell on the telephone; and that, at 6:00 p.m., Chief Jernigan told him to let the appellant have the telephone for fifteen more minutes and then turn it off and to have the jailer let him know if the appellant wanted to use the telephone the next day. Finally, Wells testified that he did not remember the appellant asking him to turn his telephone back on after he turned it off.
Simon Benson of the ABI testified that he interviewed the appellant at the Monroe County Jail at 6:55 p.m. on January 30, 2004; that Chief Investigator Terry Mason of the Monroe County Sheriff's Department and Chief Rudolph Munnerlyn of the Monroeville Police Department were with him; that they did not threaten the appellant, offer the appellant any reward, or make the appellant any promises to get him to make a statement; that they did not tell the appellant that he would be better off if he made a statement; that the appellant did not appear to be under the influence of drugs; that he advised the appellant of his Miranda rights using a form, and the appellant initialed each right and signed the document to indicate that he had been advised of his rights; that he read the appellant a waiver of rights form and explained it to him, and the appellant signed the waiver; and that the appellant made a statement at that time.
Benson also testified that he, Mason, and Munnerlyn interviewed the appellant a second time at 8:30 p.m. on January 30, 2004; that they did not threaten the appellant or offer the appellant any reward to get him to make a statement; that they did not tell the appellant that he would be better off if he made a statement; that they did not commit any acts of violence toward the appellant to get him to make a statement; that he told the appellant he wanted to clear up some things from the first statement and ask some other questions; and that he reminded the appellant of his rights, and the appellant waived them. He further testified that he did not remember the appellant asking to use the telephone or saying that he would talk to them if they turned the telephone back on.
Chief Rudolph Munnerlyn of the Monroeville Police Department testified that he, Benson, and Mason participated in the *Page 918 
interview of the appellant on January 30, 2004; that they did not threaten the appellant, make the appellant any promises, commit any acts of violence against the appellant, or offer the appellant anything to get him to make a statement; that they did not tell the appellant he would be better off if he talked to them; that the appellant did not appear to be under the influence of drugs or alcohol; and that, in his opinion, the appellant understood his rights. He also testified that, during the flight from Muscle Shoals, the appellant asked how soon he could be executed. Munnerlyn further testified that he did not remember the appellant asking them to get his telephone turned back on or saying that he would talk to them if they would turn the telephone back on.
Chief Investigator Terry Mason of the Monroe County Sheriff's Department testified that he, Benson, and Munnerlyn participated in the interview of the appellant on January 30, 2004; that they did not threaten the appellant, offer the appellant any reward, or make any promises to the appellant to get him to make a statement; that they did not commit any acts of violence toward the appellant to get him to make a statement; that he believed that the appellant understood his rights; and that he did not believe the appellant was under the influence of alcohol or drugs. He also testified that, during the second interview, they did not make any threats or promises to the appellant or commit any acts of violence toward the appellant to get him to make a statement. Finally, Mason testified that he did not remember the appellant saying that he would make a statement if they would let him use the telephone.
During the suppression hearing, the defense called the appellant, who testified that he tried to use the telephone that was in his jail cell, but it was turned off; that he was going to try to call his attorney; that he told Wells he would talk to the investigators if he would let him use the telephone; that, when Benson, Munnerlyn, and Mason arrived but before the audio-tape recorder was turned on, he told them he would talk to them if they would turn on the telephone; and that they said they would turn on the telephone if he talked to them.
Finally, the recordings of the statements indicate that the officers repeatedly advised the appellant that he had the right to speak to an attorney before they questioned him; that he had the right to have an attorney present during questioning; and that, even if he waived his rights and spoke to them, he could stop the questioning at any time. While he was making both statements, the appellant admitted that he had, of his own free will, sent word for the law enforcement officers to come back to the jail to talk to him; that he had not been mistreated while he was in the jail; and that no one had promised him anything to get him to talk to them. At the end of the second statement, the officers confirmed that the appellant knew that the judge had appointed an attorney to represent him after he read the charges to him, and they offered to give him the attorney's telephone number. The appellant said that they could give him the telephone number, but stated that there was not any reason to bother the attorney that night.
Thus, the parties presented conflicting evidence as to whether the appellant agreed to talk to the investigators in exchange for the use of a telephone.
 "`[C]onflicting evidence given at [a] suppression hearing presents a credibility choice for the trial court.' Atwell v. State, 594 So.2d 202, 212
(Ala.Cr.App. 1991), cert. denied, 594 So.2d 214 (Ala. 1992). `[A] trial court's ruling based *Page 919 
upon conflicting evidence given at a suppression hearing is binding on this Court, and is not to be reversed absent a clear abuse of discretion.' Jackson v. State, 589 So.2d 781, 784
(Ala.Cr.App. 1991) (citations omitted)."
Rutledge v. State, 651 So.2d 1141, 1144-45
(Ala.Crim.App. 1994). Based on the audio-tapes of the statements and the testimony of Benson, Munnerlyn, and Mason, the trial court could have reasonably concluded that the appellant was not coerced into making statements to investigators by not being allowed to use the telephone to contact an attorney. Therefore, the appellant's argument is without merit.
 II.
The appellant also argues that the trial court improperly admitted evidence law enforcement officers seized from the Jones and the Lazenby residences and from the Mercedes pursuant to unlawful searches. Specifically, he contends that he had an expectation of privacy in the residences and the vehicle; that officers did not obtain warrants to search the residences and the vehicle; and that he did not consent to the searches. The appellant filed a pre-trial motion to suppress the evidence officers seized from the two residences and the vehicle. However, during a pretrial suppression hearing, the defense expressly withdrew its motion to suppress with regard to the Mercedes. Therefore, we review the appellant's argument with regard to the Mercedes for plain error. See Rule 45A, Ala. R.App. P.
In its order denying the motion to suppress, the trial court found as follows:
 "Motion to suppress fruits of warrantless search and seizure is denied.
 "Notwithstanding the undersigned's finding that [the appellant] lacks standing to object to search of the Jones and Lazenby homes, court finds warrantless search[es] and seizures conducted at Jones/Lazenby homes to be justified by circumstances attendant to discovery of deceased persons Dr. Tim and Nancy Jones at Jones home on Grill [Drive]. See Ala. v. Spears, 560 So.2d 1145."
(C.R. 137-38.) Because of the varying facts and standards, we will address each residence and the Mercedes separately.
 A. The Jones Residence
We must first determine whether the appellant has standing to challenge the search and seizure with regard to the Jones residence located at 105 Grill Drive in Monroeville, Alabama.
 "An appellant wishing to establish standing to challenge the introduction of evidence obtained as a result of an alleged violation of the Fourth Amendment must demonstrate that he has a legitimate expectation of privacy in the area searched. Cochran v. State, 500 So.2d 1161 (Ala.Cr.App. 1984), rev'd in part on other grounds, 500 So.2d 1179 (Ala. 1985), on remand, 500 So.2d 1188
(Ala.Cr.App. 1986), aff'd, 500 So.2d 1064
(Ala. 1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987). . . . `A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.' Rakas v. Illinois, 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). `For a search to violate the rights of a specific defendant, that defendant must have a legitimate expectation of privacy in the place searched, and the burden is squarely on the defendant asserting the violation to establish that such an expectation existed.' Kaercher v. State, 554 So.2d 1143, *Page 920 
1148 (Ala.Cr.App.), cert. denied, 554 So.2d 1152 (Ala. 1989)."
Harris v. State, 594 So.2d 725, 727
(Ala.Crim.App. 1991).
 "`No one circumstance is talismanic to the Rakas inquiry. "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . . [the] inquiry." United States v. Salvucci, 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619, 628 (1980) (citation omitted). Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises. See, id.; Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 2559, 65 L.Ed.2d 633 (1980); Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).'
"United States v. Haydel, 649 F.2d 1152, 1155 (5th Cir.1981), cert. denied, 455 U.S. 1022, 102 S.Ct. 1721,72 L.Ed.2d 140 (1982).
 ". . . .
 ". . . Ownership or a possessory interest in property seized, while relevant in determining whether a defendant's Fourth Amendment rights have been violated, is not sufficient alone to warrant a finding that the defendant had a reasonable expectation of privacy in the place where the property was discovered. Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); Ramires v. State, 492 So.2d 615 (Ala.Cr.App. 1985)."
Kaercher v. State, 554 So.2d 1143, 1148-50
(Ala.Crim.App. 1989).
During the suppression hearing, the appellant testified that he had listed his parents' address at 105 Grill Drive as his residence on his tax returns for the previous five years; that his address on his driver's license is 105 Grill Drive; that he had received mail at 105 Grill Drive at several points in time, including during January 2004; that he had had a room with his personal belongings in it at the residence since his parents bought the residence; that he had spent the night at 105 Grill Drive without his parents being present "[p]robably two" times in the six months before January 29, 2004; and that he had stayed at 105 Grill Drive "[f]rom June to probably September" of the previous year. (R. 18-19.) He also testified that he entered his parents' residence at 105 Grill Drive with their permission on the evening of January 28, 2004; that he had permission to spend the night in the residence that night; that he was told not to return to the residence; and that there was an agreement that he would spend the night at his grandparents' residence (the Lazenby residence), which he did.
On cross-examination, the appellant admitted that he had been living in Destin, Florida, for about three months before January 29, 2004; that he was on probation in Florida, and one of the conditions of his probation was that he not leave the state without his probation officer's permission; and that he had left Destin and gone to Muscle Shoals, Alabama, for about one week before his mother took him back to Monroeville on January 28, 2004. He also admitted that he did not think he had permission to return to the Jones residence after law enforcement officers escorted him away at his parents' request. *Page 921 
Officer Michael Davenport of the Monroeville Police Department testified that he went to the Jones residence at approximately 1:00 a.m. on January 29, 2004; that the appellant was on the front porch and appeared to be nervous and agitated; that the appellant said that he lived there and wanted to get the keys to his vehicle and leave; that Officer Geraldine Owens spoke to the appellant's parents, and they said that the appellant did not need to be there and that they did not want him there; and that he took the appellant to a Winn Dixie parking lot, where the appellant planned to meet someone. He also testified that, when he was filling out a statement, the appellant told him that he lived in a condominium in Destin, Florida.
Officer Geraldine Owens of the Monroeville Police Department testified that she responded to a complaint about a disturbance at the Jones residence during the early morning hours of January 29, 2004; that the appellant's mother had apparently placed the telephone call; that she spoke to the appellant's parents, and they appeared to be agitated; that the appellant's parents requested that they remove the appellant from the premises; that she told the appellant that his parents wanted him to leave, and he said he would need a way to leave; and that Davenport transported the appellant to Winn Dixie.
Although the appellant testified that he used his parents' address as his address on various documents, that he had stayed in the Jones residence at various times during the previous year, and that he had a room with his personal belongings in the Jones residence, he also admitted that he had lived in Destin, Florida, for the three months before the murders; that his parents had told him to leave their residence on January 29, 2004; and that he did not think he had permission to return to his parents' residence after they told him to leave. In addition, the State presented testimony that the appellant's parents told law enforcement officers that they did not want the appellant at their residence and asked that they remove him from the premises. Finally, the appellant told Davenport that he lived in a condominium in Destin, Florida. Based on the evidence presented, the trial court properly concluded that the appellant did not have a legitimate expectation of privacy in the Jones residence and, thus, did not have standing to challenge the search and seizure with regard to that residence. Therefore, we need not address the merits of the appellant's argument concerning the propriety of the search of and seizure of evidence from the Jones residence.
 B. The Lazenby Residence
Assuming, arguendo, that the appellant has standing to challenge the search and seizure with regard to the Lazenby residence, his argument is without merit.
During the suppression hearing, Monroe County Sheriff Thomas Tate testified that, on January 29, 2004, law enforcement officials went to the Lazenby residence after securing the Jones residence; that the residence had belonged to Nancy's parents, who were dead; and that no one was living in the residence. Based on information that the appellant had spent the night there and might still be there, they went to the Lazenby residence to try to talk to him. When they arrived, the residence was locked, and a window had been broken out from the inside. Because they did not know who had broken the window and whether the residence was another crime scene, they got family members to let them into the residence. They
 "went in and looked, found no one there, found evidence that someone had cut themselves during the breakage of that glass in the back den area, and further *Page 922 
indications that whoever broke it was leaving the residence rather than entering the residence. There was a suitcase there which indicated that the information we had was possibly that [the appellant] had been at this residence the previous night."
(R.83-84) Tate testified that, later that night, after the appellant made a statement, he and other law enforcement officials returned to the residence to look for additional evidence, and Mr. Lazenby's grandsons opened the residence with a key they had. Finally, he testified that he thought that some blood samples and glass were taken from the residence during the first entry, but he was not sure, and that he saw agents collecting samples during the second entry.
 "`[Permission to search [may . . . be] obtained from a third party who possessed common authority
over or other sufficient relationship to the premises or effects sought to be inspected.' [United States v.] Matlock, 415 U.S. [164,] 171, 94 S.Ct. [988,] 993[, 39 L.Ed.2d 242] [(1974)] (footnote omitted) (emphasis added).
 "In Matlock, the United States Supreme Court defined `common authority' as the `mutual use of property by persons generally having joint access or control for most purposes.' 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. . . . Determining whether an individual has common authority to consent to a search is `"judged against an objective standard: would the facts available at the moment . . . `warrant a man of reasonable caution in the belief "that the consenting party had authority over the premises?' Illinois v. Rodriguez, 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990) (quoting Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968))."
Quinn v. State, 611 So.2d 483, 485-86. (Ala.Crim.App. 1992) (emphasis in second paragraph added). Seealso Maples v. State, 758 So.2d 1 (Ala.Crim.App.), aff'd,758 So.2d 81 (Ala. 1999).
The State presented evidence that the Lazenbys were dead, that no one lived in their house, and that Lazenby family members opened the house for the law enforcement officers. Based on these facts, the officers at the scene could have objectively believed that the family members had common authority over the residence and that, therefore, they could consent to the searches of the residence. Thus, "[t]his warrantless search falls within one of the well established exceptions to the requirements of both a warrant and probable cause, for it is a search that was conducted pursuant to consent. SeeSchneckloth v. Bustamonte, 412 U.S. 218, 219,93 S.Ct. 2041, 2043, 36 L.Ed.2d 854(1973)." Daniels v. State,534 So.2d 628, 653 (Ala.Crim.App. 1985), aff'd, 534 So.2d 656
(Ala. 1986). Accordingly, the appellant's argument with regard to the searches of and seizure of evidence from the Lazenby residence is without merit.
 C. The Mercedes
Because the appellant abandoned his motion to suppress with respect to the Mercedes during the suppression hearing, the evidence in this regard is scant. However, the documents included in the record indicate that the vehicle was registered to and belonged to Nancy. Also, the appellant admitted in his statement to law enforcement officers that he did not have permission to drive the vehicle, that he took the keys from Nancy's purse, and that he told Burns he stole the vehicle.
 "`Whether a person has standing to contest the constitutionality of a search and seizure depends on whether that person has a reasonable expectation *Page 923 
of privacy in the item(s) searched and/or seized.United States v. Salvucci 448 U.S. 83, 100 S.Ct. 2947, 65 L.Ed.2d 619 (1980), Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A general rule has developed, stating that a person's interest in his or her possession of stolen property is not a legitimate expectation of privacy society is willing to recognize as reasonable. See Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (fn. 4: Defendant's interest was "totally illegitimate"); United States v. Hensel, 672 F.2d 578 (6th Cir.), cert. denied, 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982); United States v. Hargrove, 647 F.2d 411 (4th Cir. [1981]); Smith v. Garrett, 586 F.Supp. 517 (D.C.W.Va.1984); McMillian v. State, 65 Md.App. 21, 499 A.2d 192 (1985); People v. Mercado, 114 A.D.2d 377, 493 N.Y.S.2d 896 (1985); Sanborn v. State, 251 Ga. 169, 304 S.E.2d 377 (1983); State v. Hamm, 348 A.2d 268 (Me. 1975). See generally W. LaFave, 3 Search and Seizure
§ 11.3 (1978). Alabama follows this general rule. See, Nelson v. State, 405 So.2d 392
(Ala.Crim.App. 1980), rev'd on other grounds — Beck v. State, 396 So.2d 645
(Ala. l980)-405 So.2d 401 (Ala. 1981).'
 "People v. State, 510 So.2d 554, 568 (Ala.Cr.App. 1986, aff'd, 510 So.2d 574 (Ala, cert. denied, 484 U.S. 933, 108 S.Ct. 307, 98 L.Ed.2d 226 (1987)."
Hall v. State, 820 So.2d 113, 133 (Ala.Crim.App. 1999), aff'd, 820 So.2d 152 (Ala. 2001).
Based on the record before us, it does not appear that the appellant has standing to challenge the search of and seizure of evidence from the stolen Mercedes. See Hall, supra; Harris, supra; Kaercher, supra. Therefore, we do not find that there was any plain error in this regard. See Eggers v. State, 914 So.2d 883
(Ala.Crim.App. 2004).
 III.
The appellant further argues that the State did not present sufficient evidence to support his convictions for the capital offense of robbery-murder. Specifically, he contends that, "[a]lthough in this case one victim's purse and automobile were taken and one victim's wallet was taken, the evidence indicates those actions to have been an afterthought and not the intent of the murders." (Appellant's brief at p. 10.)
 "In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala. 1980). The trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App. 1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199
(Ala.Cr.App. 1983); Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial *Page 924 
of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State."
Breckenridge v. State, 628 So.2d 1012, 1018
(Ala.Crim.App. 1993).
 "`In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.' Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App. 1984), affirmed, Ex parte Faircloth, 471 So.2d 493 (Ala. 1985).
 "`. . . .
 "`"The role of appellate courts is not to say what the facts are. Our role, . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury." Ex parte Bankston, 358 So.2d 1040, 1042
(Ala. 1978). An appellate court may interfere with the jury's verdict only where it reaches "a clear conclusion that the finding and judgment are wrong." Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962). . . . A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense." Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).' Granger [v. State], 473 So.2d [1137,] 1139 [(Ala.Crim.App. 1985)].
 ". . . `Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). `Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App. 1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala. 1985)."
White v. State, 546 So.2d 1014, 1017
(Ala.Crim.App. 1989). Also,
 "`[c]ircumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant's guilt. Ward v. State, 557 So.2d 848 (Ala.Cr.App. 1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979).'
 "Ward, 610 So.2d at 1191-92."
Lockhart v. State, 715 So.2d 895, 899
(Ala.Crim.App. 1997).
Section 13A-5-40(a)(2), Ala. Code 1975, provides that a murder committed "by [a] defendant during a robbery in the first degree or an attempt thereof committed by the defendant" constitutes capital murder. *Page 925 
 "(a) A person commits the crime of robbery in the first degree if he violates Section 18A-8-43 and he:
 "(1) Is armed with a deadly weapon or dangerous instrument; or
 "(2) Causes serious physical injury to another.
 "(b) Possession then and there of an article used or fashioned in a manner to lead any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument, or any verbal or other representation by the defendant that he is then and there so armed, is prima facie evidence under subsection (a) of this section that he was so armed."
§ 13A-8-41, Ala. Code 1975.
 "(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:
 "(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
 "(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property."
§ 13A-8-43, Ala. Code 1975.
 "To sustain a conviction under § 13A-5-40(a)(2) for capital robbery-murder, the state must prove beyond a reasonable doubt: (1) a `robbery in the first degree or an attempt thereof,' as defined by § 13A-S-41; (2) a `murder,' as defined by § 13A-6-2(a)(1); and (3) that the murder was committed `during' the robbery or attempted robbery, i.e., that the murder was committed `in the course of or in connection with the commission of, or in immediate flight from the commission of the robbery or attempted robbery in the first degree, § 13A-5-39(2). Connolly v. State, 500 So.2d 57
(Ala.Cr.App. 1985), aff'd, 500 So.2d 68 (Ala. 1986). The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing. Davis v. State, 536 So.2d 110 (Ala.Cr.App. 1987); Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd, Ex parte Magwood, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599
(1986). The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing. Clark v. State, 451 So.2d 368
(Ala.Cr.App.), cert. denied, 451 So.2d 368 (Ala. 1984). While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs. Thomas v. State, 460 So.2d 207 (Ala.Cr.App. 1983), aff'd, 460 So.2d 216 (Ala. 1984).
 "`As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), "the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events." Clements v. State, 370 So.2d 708, 713
(Ala.Cr.App. 1978), affirmed in pertinent part, 370 So.2d 723 (Ala. 1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr.App. 1984). To sustain any other position "would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute." Thomas v. State, *Page 926 460 So.2d 207, 212 (Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984).
 "`Although a robbery committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, supra, O'Pry v. State, supra [642 S.W.2d 748 (Tex.Cr.App. 1981)], the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379
(Ala.Cr.App. 1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. 547, 550, 142 So.2d 869, 871 (1962). The defendant's intent to rob the victim can be inferred where "[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events." Thomas v. State, 460 So.2d 207, 212
(Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984). See also Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962); Crowe v. State, 435 So.2d 1371 (Ala.Cr.App. 1983); Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala. 1980); Clements v. State 370 So.2d 708 (Ala.Cr.App. 1978), affirmed in pertinent part, 370 So.2d 723 (Ala. 1979).'
 "Connolly, 500 So.2d at 63."
Hallford v. State, 548 So.2d 526, 534-35
(Ala.Crim.App. 1988), aff'd, 548 So.2d 547 (Ala. 1989).
 "It is sometimes said that a robbery committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction for the capital offense of murder-robbery. Connolly v. State, 500 So.2d 57 (Ala.Cr.App. 1985), aff'd, 500 So.2d 68 (Ala. 1986). However, the appellant's intent to rob the victim may lawfully and correctly be inferred where the killing and the robbery were part of a continuous chain of events. Hallford v. State, 548 So.2d 526
(Ala.Cr.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342
(1989)."
Harris v. State, 671 So.2d 125, 126
(Ala.Crim.App. 1995). Finally,
 "`[i]ntent, . . . being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.' McCord v. State, 501 So.2d 520, 528-529 (Ala.Cr.App. 1986), quoting Pumphrey v. State, 156 Ala. 103, 47 So. 156 (1908)."
French v. State, 687 So.2d 202, 204
(Ala.Crim.App. 1995), aff'd in part, rev'd in part on other grounds,687 So.2d 205 (Ala. 1996).
 "`The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury. McMurphy v. State, 455 So.2d 924 (Ala.Crim.App. 1984); Craig v. State, 410 So.2d 449 (Ala.Crim.App. 1981), cert. denied, 410 So.2d 449 (Ala. 1982).' Loper v. State, 469 So.2d 707, 710 (Ala.Cr.App. 1985)."
Oryang v. State, 642 So.2d 989, 994
(Ala.Crim.App. 1994).
In this case, the State presented evidence that the appellant wanted to go to Muscle Shoals, that the victims repeatedly refused to allow him to use a vehicle to drive there, and that the victims had threatened to report him to Florida law enforcement authorities. It also presented evidence that, after he killed the victims, the appellant took Nancy's purse and vehicle and Tim's wallet, used one of Nancy's credit cards to buy gas, used cash he found *Page 927 
to buy crack, and drove to Muscle Shoals. Although the appellant stated that he intended only to kill the victims to stop their suffering and contends that the robbery was a mere afterthought, his intent was a question for the jury to resolve. In this case, the jury could have reasonably concluded from the facts and circumstances that the robberies began when the appellant attacked the victims; that the capital offenses were consummated when the appellant took the victims' property and fled; that the killings and robberies were part of a continuous chain of events; and that the robberies were intentional and were not a mere afterthought. Therefore, the appellant's argument is without merit.
 IV
In addition, the appellant argues that "[t]he failure of the State of Alabama to take into consideration the diminished mental capacity of the [appellant] in the guilt phase of the trial is in violation of the United States Constitution's due process mandate." (Appellant's brief at p. 11.) Because he did not first present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
We addressed and rejected a similar argument in Williams v.State, 710 So.2d 1276, 1309 (Ala.Crim.App. 1996), aff'd,710 So.2d 1350 (Ala. 1997), explaining as follows:
 "The appellant contends that the express repudiation of the diminished capacity defense in § 13A-3-1
denies him due process and renders the statute unconstitutional . . . After defining mental disease and defect and making it an affirmative defense, § 13A-3-1 provides that `[m]ental disease or defect does not otherwise constitute a defense.' . . .
 "The doctrine of diminished capacity provides that evidence of an abnormal mental condition not amounting to legal insanity but tending to prove that the defendant could not or did not entertain the specific intent or state of mind essential to the offense should be considered in determining whether the offense charged or one of a lesser degree was committed. 22 C.J.S., Criminal Law § 97 (1989). See also W. LaFave and A. Scott, Substantive Criminal Laws, § 4.7 (1986) (noting that the doctrine of diminished capacity is recognized in some jurisdictions). Alabama has expressly rejected this doctrine. Barnett v. State, 540 So.2d 810 (Ala.Cr.App. 1988); Hill v. State, 507 So.2d 554 (Ala.Cr.App. 1986), cert. denied, 507 So.2d 558 (Ala. 1987); Neelley v. State, 494 So.2d 669
(Ala.Cr.App. 1985), aff'd 494 So.2d 697 (Ala. 1986), cert. denied 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987). A state is not constitutionally compelled to recognize the diminished capacity doctrine. Campbell v. Wainwright, 738 F.2d 1573 (11th Cir.1984); Muench v. Israel, 715 F.2d 1124 (7th Cir.1983), cert. denied, Worthing v. Israel, 467 U.S. 1228, 104 S.Ct. 2682, 81 L.Ed.2d 878 (1984); Chestnut v. State, 538 So.2d 820 (Fla. 1989). The express repudiation of the diminished capacity doctrine [in] § 13A-3-1 does not render that statute unconstitutional. We find no merit to the appellant's contention, and certainly do not find plain error."
Similarly, we do not find that there was any error, much less plain error, in this regard.
During oral argument before this court, the appellant's counsel conceded that his argument in his brief on this issue was not clear, and he attempted to clarify his argument. At that time, citing the evolving standards of decency referenced inAtkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242,153 L.Ed.2d 335 (2002), and Roper v. Simmons,543 U.S. 551, 125 S.Ct. 1183, *Page 928 161 L.Ed.2d 1 (2005), he contended that it would be cruel and unusual to subject the appellant to the death penalty in light of his lack of emotional development. "There is an abundance of caselaw, however, that holds that the death penalty is not per se cruel and unusual punishment." Stewart v. State,730 So.2d 1203, 1242 (Ala.Crim.App. 1997) (opinion on third return to remand), aff'd, 730 So.2d 1246 (Ala. 1999). Also, the Supreme Court's decisions in Atkins and Roper apply only in limited circumstances, and we are not in a position to expand those decisions as the appellant would have us do.See Benjamin v. State, 940 So.2d 371
(Ala.Crim.App. 2005). Therefore, the appellant is not entitled to relief in this regard.
 V.
Finally, the appellant argues that,
 "[i]n the penalty phase of the trial, the court considered as an aggravating factor murder during the course of a robbery. There was insufficient evidence presented at trial to support that theory and, as such, that issue was improperly considered by the court in determining that the appellant should receive the death penalty."
(Appellant's brief at p. 13.) Because he did not first present this argument to the trial court, we review it for plain error.See Rule 45A, Ala. R.App. P.
 "`This practice, known as "double counting" or "overlapping," has been upheld. Haney v. State, 603 So.2d 368 (Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel [v. State, 577 So.2d 474, 489 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)].
 "`Section 13A-5-50, Code of Alabama 1975, states, in part, as follows:
 "`"The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."
 "`Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense. Kuenzel, supra; see also Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
 "`"A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy."
 "`Kuenzel, 577 So.2d at 488, quoting Fortenberry v. State, 545 So.2d 129, 142
(Ala.Cr.App. 1988), aff'd, 545 So.2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).'
 "Burton, 651 So.2d at 657-58."
Hutcherson v. State, 677 So.2d 1174, 1201
(Ala.Crim.App. 1994), rev'd on other grounds, 677 So.2d 1205
(Ala. 1996).
For the reasons set forth in Part III of this opinion, the State presented sufficient evidence to support the appellant's convictions *Page 929 
for the capital offense of robbery-murder. Therefore, during the penalty phase of the trial, the trial court properly considered the aggravating circumstance that the appellant committed the capital offenses while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery. Accordingly, we do not find that there was any error, much less plain error, in this regard.
 VI.
Pursuant to § 13A-5-53, Ala. Code 1975, we are required to address the propriety of the appellant's convictions and sentence of death. The appellant was indicted for and convicted of two counts of capital murder because he committed the murders during the course of a robbery, see §13A-5-40(a)(2), Ala. Code 1975, and an additional count of capital murder because he murdered two people pursuant to one scheme or course of conduct, see §13A-5-40(a)(10), Ala. Code 1975.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstance. It found that the State proved the existence of four aggravating circumstances: 1) the appellant had previously been convicted of another capital offense or felony that involved the use or threat of violence to the person, see § 13A-5-49(2), Ala. Code 1975; 2) the appellant committed the capital offenses while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery, see § 13A-5-49(4), Ala. Code 1975; 3) the capital offenses were especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975; and 4) the appellant intentionally caused the death of two or more people by one act or pursuant to one scheme or course of conduct, see § 13A-5-49(9), Ala. Code 1975. The trial court did not find that any statutory mitigating circumstances existed. With regard to nonstatutory mitigating circumstances, the trial court made the following findings:
 "[The appellant's] characterological profile detailed by the three psychologists discussed above taken as a whole does comprise a mitigating circumstance."
(C.R. 40.) The sentencing order shows that the trial court weighed the aggravating circumstances and mitigating circumstance and correctly sentenced the appellant to death. The record supports its decision, and we agree with its findings.
Section 13A-5-53(b)(2), Ala. Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. The appellant committed two murders during the course of two robberies and killed two people pursuant to one scheme or course of conduct. Similar crimes are being punished by death throughout this state. See Gaddy v. State,698 So.2d 1100 (Ala.Crim.App. 1995), aff'd, 698 So.2d 1150 (Ala. 1997);Brooks v. State, 695 So.2d 176 (Ala.Crim.App. 1996), aff'd, 695 So.2d 184 (Ala. 1997); Bush v. State,695 So.2d 70 (Ala.Crim.App. 1995), aff'd, 695 So.2d 138 (Ala. 1997);Taylor v. *Page 930 State, 666 So.2d 36 (Ala.Crim.App.), opinion extended after remand, 666 So.2d 71 (Ala.Crim.App. 1994), aff'd,666 So.2d 73 (Ala. 1995); Holladay v. State, 549 So.2d 122
(Ala.Crim.App. 1988), aff'd, 549 So.2d 135 (Ala. 1989); Siebertv. State, 555 So.2d 772 (Ala.Crim.App.), aff'd,555 So.2d 780 (Ala. 1989); Peoples v. State, 510 So.2d 554
(Ala.Crim.App. 1986), aff'd, 510 So.2d 574 (Ala. 1987). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, and we have not found any. See Rule 45A, Ala. R.App. P.
Accordingly, we affirm the appellant's convictions and sentence of death.
AFFIRMED.
McMILLAN, P.J., and COBB, SHAW, and WISE, JJ., concur.